# EXHIBIT J

1                          REPORTER'S RECORD
                        VOLUME 1 OF 1 VOLUMES
2                       CAUSE NO. 2015-03795J

3    IN THE INTEREST OF          )  IN THE DISTRICT COURT
                                 )
4    D▮▮▮▮▮ T▮▮ AND P▮▮▮ T▮▮     )  HARRIS COUNTY, TEXAS
                                 )
5    CHILDREN                    )  314TH DISTRICT COURT

6              *********************************

7                      SHOW CAUSE HEARING

8              *********************************

9          On the 7th day of July, 2015 the following

10   proceedings came on to be heard in the above-entitled

11   numbered cause before the Honorable John Phillips, Judge

12   presiding, held in Houston, Harris County, Texas.

13          Proceedings reported by Computerized Stenographic

14   Machine Method.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2    Mr. DanPhi Nguyen
      SBOT: 16951500
 3    ASSISTANT COUNTY ATTORNEY
      1019 Congress, 17th Floor
 4    Houston, Texas 77002
      Telephone:  713-274-5229
 5    Counsel for T.D.F.P.S.

 6    Mr. Michael Craig
      THE LONGWORTH LAW FIRM
 7    SBOT NO. 24072214
      1385 FM 359 Road, Suite 308
 8    Richmond, Texas  77406-2017
      Telephone:  832-372-7146
 9    Counsel for The Child

10    Mr. John Na
      ATTORNEY AT LAW
11    SBOT NO.
      2915 Fannin
12    Houston, Texas  77002
      Telephone:  713-655-0737
13    Counsel for Respondent Mother

14    Mr. Shandon Phan
      ATTORNEY AT LAW
15    SBOT NO. 14052700
      11205 Bellaire Blvd., Suite B-31
16    Houston, Texas  77072
      Telephone:  281-407-5622
17    Counsel for Respondent Father

18    Also Present:  Ms. Natalie Nguyen, Acting Vietnamese
      Interpreter
19

20

21

22

23

24

25
```

3

```
 1                    I N D E X
                      VOLUME 1
 2                (SHOW CAUSE HEARING)

 3   July 7, 2015                          Page    Vol.

 4   Announcements.................................  4      1

 5   Petitioner's Witness      Direct       Cross         Vol.

 6   SHAYLONDA HERRON             4                          1

 7     By Mr. Na                              6             1

 8     By Mr. Phan                            8             1

 9     By Mr. Craig                          13             1

10   LAKEISHA CHEETUM           16                          1

11     By Mr. Phan                          18             1

12   Respondent Father's Witness  Direct     Cross         Vol.

13   TRANG VU                    20                          1

14     By Mr. Nguyen                        29             1

15   Court's Ruling................................. 31      1

16   Adjournment.................................... 32      1

17   Court Reporter's Certificate................... 33      1

18

19

20

21

22

23

24

25
```

APPENDIX 0159

```
 1                   P R O C E E D I N G S
 2              MR. NGUYEN:  Your Honor, we are here in the
 3   interest of P███   and D█████    T███ for a show cause hearing,
 4   cause number 2015-03795J.  Present before the Court,
 5   Mr. Michael Craig is the attorney ad litem for the children.
 6   Mr. John Na has been retained by the mother Ms. Tuyet Tran,
 7   he is the attorney for the mother, she is also present.  And
 8   Mr. Shandon Phan is here with his client, the alleged father
 9   Trang Vu, he is also present.  D.F.P.S. caseworker, myself
10   Mr. DanPhi Nguyen, the Harris County Attorney's Office.
11   Ms. Natalie Nguyen, she works in the same office with
12   Mr. John Na.  We have all agreed to allow Ms. Natalie to
13   interpret Vietnamese to the mother.  All right.
14                        SHAYOLONDA HERRON
15              After having first been duly sworn, testified as
16   follows:
17                D I R E C T   E X A M I N A T I O N
18   BY MR. NGUYEN:
19        Q    Caseworker, please state your name.
20        A    Shayolonda Herron.
21        Q    And how old are these two kids?
22        A    D█████ is ten.  P███ is eleven.
23        Q    Okay.  And where are they currently placed at this
24   time?
25        A    They're in a foster home.
```

```
1       Q    All right.  And we're currently exploring
2   relatives, correct?
3       A    That is correct.
4       Q    There are relatives that we found on maternal side
5   of the family?
6       A    Correct.
7       Q    Okay.  Now you've interviewed the children,
8   correct?
9       A    Yes.
10      Q    There have been allegations of domestic violence
11  in the home?
12      A    That's correct.
13      Q    Can you explain to the Court what those
14  allegations were?
15      A    The kids exposed that there's constant fighting
16  between Mom and Dad.  They've observed Dad choke Mom and
17  that they're afraid.
18      Q    Did they disclose to you how frequently this has
19  been happening?
20      A    Yes.  They stated that this has been -- this occur
21  on a weekly basis.
22      Q    Okay.  And did they disclose how long it's been
23  happening?
24      A    Yes.  They stated that these has been going on for
25  years.
```

```
1        Q    For years.  And have there been any police
2   call-outs in the home?
3        A    I requested them, but I haven't received them
4   back.  But Dad confirmed that they have notified -- law
5   enforcement has come out to the home.
6        Q    That is based on what Dad is telling you?
7        A    That is correct.
8        Q    Okay.  You feel that the domestic violence in the
9   home is a dangerous environment for these children?
10       A    Absolutely.
11       Q    That's the reason why you felt compelled to remove
12  them, correct?
13       A    Yes.
14            MR. NGUYEN:  I'll pass the witness at this
15  time.
16            MR. NA:  Yes.
17            C R O S S   E X A M I N A T I O N
18  BY MR. NA:
19       Q    Sorry.  What was your name?
20       A    Shayolonda.
21       Q    Ms. Shayolonda, are you aware that the parents
22  have since separated?
23       A    Yes, I am.
24       Q    And during your studies, have you ever found Mom
25  to be -- have you ever found Mom to be a threat to the
```

1  children?

2       A     Only concern with Mom is that she's allowed this

3  to occur all these years without protecting the children.

4       Q     But the -- she was the one being abused, correct?

5       A     That is correct.

6       Q     And so when you say she allowed it to happen, she

7  was allowing herself to be abused, not the children,

8  correct?

9       A     Correct.  But she knew how the dad's behaviors are

10  and she stayed in that environment.

11       Q     And did the children say that they were ever hit

12  by the father?

13       A     Yes.

14       Q     And when was the last time?

15       A     I don't know the exact date but they said that if

16  they don't complete their homework that he has assigned to

17  them, he gets upset and he has hit them before.

18       Q     And -- but you can't remember the last time that

19  happened?

20       A     No.

21       Q     And is punishing -- is that considered punishment

22  or is that like abuse?  In your opinion.

23       A     According to the behavior, I don't think -- I feel

24  that the children are afraid of their father.

25       Q     But not of the mother, correct?

```
1        A    No.  They did not say they're afraid of their

2    mother.

3        Q    And if the parents have separated, in your

4    opinion, would that be an immediate threat to the children

5    if the children were with the mother?

6        A    Yes.  Because Mom needs to take domestic violence

7    classes so that this will not occur again.  So she can

8    prevent this from happening again.

9        Q    Prevent what from happening?

10       A    Domestic violence.

11       Q    Towards her.

12       A    Towards her and putting the children in that

13   environment again.

14       Q    But they're not gonna be in that environment.  The

15   parents are separated, correct?

16             MR. NGUYEN:  Objection.  Argumentative.

17       A    We don't know if they're gonna be in that

18   environment.

19             MR. NA:  No further questions, Your Honor.

20             THE COURT:  Anybody else?

21        C R O S S   E X A M I N A T I O N

22   BY MR. PHAN:

23       Q    Yes.  Ms. Shayolonda?

24       A    Yes, sir.

25       Q    You stated that when you spoke to the children,
```

1    the children told you that police went to the house.  Did

2    you ask them when?

3         A    They couldn't give me an exact date.

4         Q    Did they -- did you ask to get a chance of when

5    that occurred?

6         A    Yes.

7         Q    Maybe this year, maybe two, three years ago?

8         A    They couldn't give me a date.  All they said was

9    law enforcement has come to their home for their parents

10   fighting.  And they told me that they've called law

11   enforcement.

12        Q    Okay.  When the children told you that the father

13   hit them, did you try to verify whether the father tried to

14   punish the children, did you inquire further as part of your

15   job?

16        A    They said that their father was -- would hit them

17   if they didn't do their homework and that he would hit them

18   on their arm with his fist.

19        Q    Okay.  And you have no idea when that happened?

20        A    No, I don't have an exact date.

21        Q    And do you have anything on record to show that

22   the father was ever abusing these children besides the

23   testimony that you shared with us today?

24        A    No.  Just the disclosure from the children.

25        Q    Okay.  And did the mother and the father

1   collaborate with you in your conducting of investigation?

2       A     At the end, yes.  After we took custody of the

3   kids, Dad was very cooperative.

4       Q     Okay.  How did they answer your inquiries in the

5   beginning that caused you to believe that they did not

6   collaborate?

7       A     Well the initial -- the first time I went to the

8   home -- well first of all, I had a difficult time reaching

9   out, getting a hold of the family to do interviews.  When I

10  did make an appointment with Dad, things got a little out of

11  hand.  Dad agreed to speak with me but he wanted to be

12  present when I talked to the children.  And after that, it

13  was a unrelated home member that basically threw me out the

14  home.

15      Q     Who is that unrelated member of the home?

16      A     Robbins Mitchell.

17      Q     Did he have authorization to throw you out the

18  home when -- you claim that the father was still there.  So

19  how would a tenant have authorization to throw you out the

20  home?

21              MR. NGUYEN:  Objection.  Relevance.

22              THE COURT:  Overruled.  Go ahead.

23      A     Dad never stopped the unrelated home member from

24  verbally attacking me.  He didn't -- he allowed this to

25  happen in the home.

1      Q     (By Mr. Phan) So the Mr. Robbins?

2      A     Yes.

3      Q     Okay.  Mr. Robin verbally attacked you?

4      A     Correct.

5      Q     What did he say to be construed as verbally

6   attacking you?

7      A     He was calling me coward, saying I was a liar.  He

8   was just yelling.

9      Q     And how did the father react?

10      A     He didn't do anything.

11      Q     He didn't do anything.  Okay.  Did you recall a

12   letter sent by my client to you and to the county attorney

13   in which he showed you videos and acknowledged that he tried

14   to intervene and later on apologize to you and that was on

15   the video that he recorded?  Do you remember that?

16                 MR. NGUYEN:  Objection.  Assumes facts not in

17   evidence.

18                 THE COURT:  Overruled.

19      A     Dad -- when I went out to the home and

20   Mr. Mitchells was talking to me and calling me all these

21   names, Dad never stopped Mr. Mitchell from talking to

22   continue the investigation.  I gave Dad an opportunity to

23   come to the office to discuss the investigation and he did

24   not want -- he wanted me to close the case.

25      Q     (By Mr. Phan) But did the father kicked

1    you out or ask you to leave the house or Mr. Robbins

2    did that?

3         A    I left the home because the children were present

4    and the yelling was -- had escalated and I didn't want to

5    put the kids in that type of environment.

6         Q    What was the yelling -- what was the cause of the

7    yelling in between who?  Which party?

8         A    Mr. Mitchells was yelling at me and D██████ was

9    present at the table.  And with all this yelling going on,

10   like I said, Dad never intervened to tell him to stop or let

11   him talk to me or anything.

12        Q    Okay.  And in your opinion, that construed to be

13   non-collaborated with you?

14        A    Yes.  Because I couldn't finish the investigation

15   to see exactly what was going on.

16        Q    Was there any question or request that you have

17   for the father that he failed to respond to you?

18        A    I e-mailed Dad and asked him if we can finish the

19   investigation at my office.  And his response was, he didn't

20   want this investigation open, he wanted it closed and he

21   didn't want CPS involved with his family.

22        Q    Only when he failed to -- only when he failed to

23   get you to come back to the house and resolve it, right?

24        A    He didn't ask me to come back to the house.  I

25   asked if he can come to my office.

```
1        Q    Uh-huh.  Okay.

2        A    And at that point, it took him a few days to

3   respond and when he did respond, his response was that he

4   wanted the investigation closed.

5        Q    Okay.  And you didn't follow up with any further

6   action?

7        A    No.  He wanted it closed.  He wasn't willing to do

8   anything else.

9        Q    Okay.  And -- okay.  And did the mother

10  collaborate with you?

11       A    She did.

12       Q    Okay.

13            MR. PHAN:  No further questions, Your Honor.

14            MR. CRAIG:  Quickly, Your Honor.

15            C R O S S   E X A M I N A T I O N

16  BY MR. CRAIG:

17       Q    Ma'am, you were upstairs with me with the children

18  an hour ago?

19       A    Yes, sir.

20       Q    Okay.  The children report pervasive and

21  consistent domestic violence in the home, correct?

22       A    Yes, sir.

23       Q    The children report that they've been punched by

24  their father.

25       A    Correct.
```

```
 1         Q     That the father has slammed the mother against a
 2   wall.
 3         A     Yes.
 4         Q     It happens regularly.
 5         A     Correct.
 6         Q     Clearly these children are in danger, correct?
 7         A     Yes.
 8         Q     Okay.  Now the children are in foster care; is
 9   that correct?
10         A     Yes.
11         Q     Now the children have not indicated at all that
12   they have any fear of their mother, have they not?
13         A     That's correct.
14         Q     If the mother's in a location that the father
15   doesn't know about, wouldn't it make sense to put the
16   children with the mother temporarily, now?
17         A     Yes.  But my only concern would be that the
18   children -- Dad would have access with them online and
19   things and I don't want them -- I want Dad to work on
20   hisself.
21         Q     I understand that.
22         A     But him controlling them via e-mail and things of
23   that nature, I don't -- they're afraid.
24         Q     Okay.  And to clarify.  When you went out to do
25   your investigation, there were other adults in the home?
```

```
 1   Besides the parents?

 2        A    Yes.  Mr. Mitchell.

 3        Q    And who is Mr. Mitchell?

 4        A    He's an unrelated home member who rents a room

 5   from the family.

 6        Q    How many people rent rooms in this home?

 7        A    To my knowledge, I just knew about Mr. Mitchells

 8   until I learned of another guy.

 9        Q    Okay.

10        A    In the home.

11        Q    Are there any concerns about those folks?

12        A    I don't know anything about them.

13        Q    Okay.  You think it's in the best interest that

14   the agency be involved with the parents right now?

15        A    Yes.

16        Q    Okay.  If the father was ordered not to have

17   contact with his wife, do you think it would be still -- in

18   that case, do you think it would be in the best interest to

19   let the mother have the children now --

20        A    Yes.

21        Q    -- if there's a Court order?

22        A    Yes.

23        Q    That she keep them safe and away from the father.

24   That way we can avoid foster care.

25        A    Yes.
```

```
1              MR. CRAIG:  Pass the witness.
2              MR. NGUYEN:  I'd like to call the deputy
3   constable.  Everyone's done with this witness, correct?
4   Caseworker?
5              MR. NA:  Yes.
6                    LAKEISHA CHEETUM
7         Having first been duly sworn, testified as
8   follows:
9            D I R E C T   E X A M I N A T I O N
10  BY MR. NGUYEN:
11     Q    Ma'am, please state your name.
12     A    I'm Lakeisha Cheetum, deputy constable with Harris
13  County at Precinct Five.
14     Q    And you are the constable who executed the writ of
15  attachment in removing the children, correct?
16     A    Correct.
17     Q    When did that occur?
18     A    That occurred June 24th, approximately 4:00 p.m.
19     Q    Okay.  And when you went to go remove the children
20  from the home, who was in the home when you went there?
21     A    At the front door, we encountered a male later
22  identified as Robbins Mitchell.
23     Q    Okay.
24     A    He began to refuse us access, one, into the home;
25  and two, to check the welfare of the children whom we
```

1    visually saw with our own eyes directly behind him in the

2    foyer of the home.

3        Q    Okay.  Anything in that home that gave you some

4    cause for concern for the children's well being?

5        A    There was nothing physically in the home that

6    caused us concern for the children's well being, it was the

7    individual who we, who we encountered made us kind of weary

8    about the children's safety, being that he was the only

9    adult male and the approach that he gave us.

10        Q    Okay.  You're speaking about Mr. Robbins Mitchell,

11    correct?

12        A    Yes.

13        Q    Did you do, like a background check on him to see

14    what he was about?

15        A    The background check didn't happen until after we

16    had to take custody of Mr. Mitchell for interfering with

17    public service.

18        Q    Okay.  Anything that you saw about Mr. Mitchell

19    that you felt there was a concern about?

20        A    Being that the children of minor children age,

21    Mr. Mitchell had on a satin house robe with no

22    undergarments.

23        Q    Okay.  And did you get to check the records to see

24    if there was any call-outs for domestic disturbance or

25    domestic violence by H.P.D. or Harris County?

1        A      Yes.   We went back -- ten years back and we

2    checked the status for calls of service for H.P.D. and

3    Harris County and there is only one, but there has not been

4    any for domestic violence.

5        Q      And that's at the parent's address, correct?

6        A      Correct.

7        Q      On Sandstone?

8        A      At Sandstone.

9        Q      And that one call that you're talking about, which

10   call was that about?

11       A      That was an assault that occurred at D████'s

12   school.

13       Q      Okay.   So that was not about the domestic violence

14   between the parents?

15       A      No, it was not.

16       Q      Okay.

17              MR. NGUYEN:   Pass the witness, Judge.

18              MR. NA:   I don't think I have any questions,

19   Your Honor.

20              THE COURT:   Questions?

21              MR. PHAN:   Yes, Your Honor.   Just a few.

22              C R O S S   E X A M I N A T I O N

23   BY MR. PHAN:

24       Q      So when you came to the house, Mr. Mitchell, he

25   opened the door, what did he do?

```
1        A    He refused --

2        Q    Or say to you.

3        A    After we officially identified ourself and

4   addressed him to the order in which we were there on, which

5   was the writ of attachment, he basically refused to

6   cooperate, refused to give his name under the orders of the

7   parent.  He said that he wasn't allowing us visual aspect on

8   the children nor was he allowing us to speak with the

9   children and he ordered the children upstairs.

10       Q    Okay.  And did you make any reasonable effort to

11  contact the parents yourself?

12       A    Yes.

13       Q    How?

14       A    On the cell phone.

15       Q    And did they respond?

16       A    Yes.  He advised that he will not allow us access

17  to the children or to his home.

18       Q    The father?

19       A    The father.

20       Q    Okay.  Did you show them any court document and

21  the reason why you're there?

22       A    Yes.

23       Q    Okay.  To Mr. Mitchell, right?

24       A    To Mr. Mitchell.

25       Q    Not to the father.
```

```
1        A     The father was not on location.

2        Q     Okay.  And that was the only effort you made?

3        A     To show him the document?

4        Q     To contact him and to show him the document.

5        A     Yes.

6        Q     Okay.

7              MR. PHAN:  No further questions, Your Honor.

8              MR. CRAIG:  No questions, Judge.

9              MR. SPJUT:  No questions, Judge.

10             MR. NGUYEN:  No more questions, Judge.

11             THE COURT:  Anybody else have any testimony

12  or evidence they want to present?

13             MR. CRAIG:  No, Your Honor.

14             MR. NGUYEN:  No, Judge.

15             MR. PHAN:  Yes, Your Honor.  I would like to

16  call my client Mr. Vu.

17             THE COURT:  All right.

18                         TRANG VU

19        Having first been duly sworn, testified as

20  follows:

21             D I R E C T   E X A M I N A T I O N

22  BY MR. PHAN:

23        Q     You heard the testimony from the deputy and also

24  the caseworker.  Did you collaborate with them?  First with

25  Ms. Yolanda (sic) when she came to your house to
```

 1    investigate?

 2        A    Yes, I did.

 3        Q    She claim that you did not collaborate in the

 4    beginning.  Can you explain why she would come to such a

 5    conclusion?

 6        A    I sent them -- when I heard that there's some

 7    people came to my house want to talk with the kids.  And

 8    then I said, I feel strange because I don't want anybody to

 9    interfere with my family and I want to protect my family's

10    privacy and my rights.  So therefore, I -- my wife give me

11    seal on our business card that's when I e-mail her.

12             I told her -- I politely invite her to come

13    to my house formally and have a meeting to find out what's

14    her investigate, investigations about.  When we agreed to a

15    date, on that Saturday she came to my house I was cutting

16    my -- taking care of the yard.  I came in and have her came

17    her inside the house and have a meeting.

18             We were talk normally and she ask me about --

19    what I think about D██████'s play choking, play hard on his

20    friends in school, the incident.  And as I was explaining to

21    her, Robin Mitchell step out of the room.  He just a -- he

22    rent a room there, that's all.  He just stay in a room.

23             MR. NGUYEN:  Judge, can I object to the

24    narrative of this.

25             THE COURT:  That's sustained.  Let's answer a

```
1    question that's posed to you and only answer the question
2    that's asked.
3         A    So what's your question again?
4         Q    (By Mr. Phan) So my question is, did you
5    collaborate with Ms. Yolanda (sic) when she first
6    came to your home to investigate and if she claim
7    that you did not, do you have an explanation, short
8    explanation why?
9         A    No.  I collaborate with her fully.  I work with
10   her, give her informations, but then we were interrupted by
11   Mr. Robbins Mitchell.
12        Q    Okay.  And when Mr. Mitchell intervene, why -- why
13   did you prevent Mr. Mitchell from intervening into your
14   conversation with the caseworker?
15        A    Yes.  When Shayolonda request to have a private
16   meeting with me and her, I told Robin Mitchell to leave the
17   room, so we can continue her investigation privately.
18        Q    You did ask Mr. Mitchell to leave the room?
19        A    I did.  After she request, I say yes, I agree to
20   that.  And I asked Mr. Robin Mitchell to leave room.
21        Q    Did Mr. Mitchell comply --
22        A    No.
23        Q    -- with your request?
24        A    He did not.  He continue on, want to fight with
25   Shayolonda.  And that's when I stepped back and I say, this
```

 1   has got out of my hand.

 2        Q     So the argument was mostly between Ms. Yolanda

 3   (sic) and Mr. Mitchell?

 4        A     That's correct.  When Robin Mitchell took over

 5   the, the meeting, he start calling her names.

 6        Q     And you did ask him to leave the room?

 7        A     I did.

 8        Q     Okay.

 9        A     But --

10              MR. NGUYEN:  Objection.  Nonresponsive after

11   yes.

12              THE COURT:  Just answer the question asked,

13   please.

14        Q     (Mr. Phan) Okay.  And when the deputy

15   arrived at your residence to take the children away,

16   she stated she spoke on the phone with you.  Did you

17   tell her not to take your children away?  Did you

18   make any effort to get there?

19        A     Yes.  I was driving on the freeway coming to my

20   house.  I left my work early, I told my boss --

21              THE COURT:  All right.  We're gonna finish

22   this after lunch.  We'll see you back about 1:15, 1:20.

23              MR. PHAN:  Thank you, Judge.

24          (Lunch recess taken.  Off the record.)

25          (Open court.  All parties present.)

```
 1              MR. NGUYEN:  All right.  Judge, we're back on
 2   the record in the interest of P█████ and D███████ T███, cause
 3   number 2015-03795J.  All parties are present with us today.
 4   I believe Mr. Shandon Phan was in the middle of questioning
 5   his client.  Mr. Phan.
 6        Q    (By Mr. Phan)  Mr. Vu, let's continue.
 7        A    Yes, sir.
 8        Q    Where was I?  Where was -- where was I?  You
 9   testified that you try your best to communicate with the
10   caseworker?
11        A    That's correct.
12        Q    And in your letter, in your apology letter to her,
13   you tried to explain that you involve Mr. Mitchell to leave
14   the room?
15        A    That's correct.  I did that and I have a video --
16              MR. NGUYEN:  Objection.  Nonresponsive.
17              THE COURT:  Just answer the question asked.
18        A    Yes, sir, I did.  I respond to her that I did try
19   to work with her to complete her investigation.
20        Q    (By Mr. Phan)  All right.
21        A    In my e-mail.
22        Q    And what was the reason to have a digital
23   recording of the --
24              MR. NGUYEN:  Objection.  Relevance.
25              THE COURT:  That's sustained.
```

1      Q    (By Mr. Phan) On the day when the deputy

2    came to the residence, did you make an effort to try

3    to meet with the deputy when they tried to get the

4    children from the residence?

5                MR. NGUYEN:  Objection.  Asked and answered.

6                THE COURT:  That's sustained.  Let's move

7    along to something new.

8                MR. PHAN:  The respondent would like to

9    introduce into evidence two letters from respondent Mr. Vu.

10   The letter was e-mailed to the county attorney along with

11   the caseworker and her supervisor apologizing for the

12   incident and also explaining what happened.  Do you

13   recognize that to be a copy of the e-mail you receive?

14               MR. NGUYEN:  I have no objections to this,

15   Judge.

16               THE COURT:  All right.

17               MR. CRAIG:  No objection.

18               THE COURT:  Uh-huh.

19               MR. NA:  No objection, Judge.

20               MR. PHAN:  And the respondent would also like

21   to introduce evidence a parent petition, another letter

22   included by Mr. Vu explaining his version of event.

23               MR. NGUYEN:  I have no objection to this

24   either.  I've seen this.  Why don't you mark these.

25               MR. PHAN:  Okay.

```
 1                    MR. NGUYEN:  As Respondent Father 1 and 2.
 2          Q    (By Mr. Phan) Did you ever hit the
 3     children?
 4          A    No, sir.  I never hit my children.
 5          Q    The caseworker that went to talk to your children,
 6     they told caseworker that you did hit your children several
 7     times.
 8          A    Hitting meaning that in the course of training my
 9     kids --
10                    MR. NGUYEN:  Objection.  Nonresponsive.  I
11     didn't hear a question.
12          A    I disciplined --
13                    MR. NGUYEN:  Just ask a question.
14          Q    (By Mr. Phan) How do you explain that your
15     children say with the caseworker you did hit them
16     several times?
17          A    Hitting them in the course of disciplining them.
18     Several time, they, they don't do their homework when I was
19     at work.  So when I came home I found out.  I'd told them
20     continue do their homework.  And I even make them log in a
21     daily log what exactly they do.  Because I know that
22     sometime they get carried away and they just play all days
23     at home, watch video.  So therefore, I want to put them on
24     the right track so they can continue their study.  But
25     hitting, meaning disciplining, not to abuse the kids.
```

1       Q     Okay.

2       A     Hitting, like maybe like touching them or not to

3   abuse them, sir.

4       Q     And when was the last time that you punished your

5   children that way?

6       A     I don't remember because I never try to do that so

7   I just don't do that.

8       Q     Okay.  And did your wife object to that teaching,

9   that type punishment or disagree with it?

10      A     Several times, my wife say, well I make the kids

11  study too much, too hard.  And I change, you know, I take

12  them out to places and do different things, you know, normal

13  activities.  But my expectations that they need to complete

14  their daily homework for -- before they can go outside the

15  house and play.  And I even set up basketball court --

16                  MR. NGUYEN:  Objection to the narrative,

17  Judge.

18                  THE COURT:  Yeah.  Just answer the question

19  asked.

20      A     Yes.

21      Q     (By Mr. Phan) As a result of your teaching

22  or punishment, do you feel that your children make

23  improvement in their behavior or their school

24  performance?

25      A     Oh yes.  Absolutely.  Like I told Shayolonda in

APPENDIX 0183

1  the e-mail, they're the fastest typist in the whole school.

2  They got straight A's, report card, they in the gift and

3  talented programs.  They do gift and talent shows.  There's

4  no other kids can do what they can do.  They can --

5          MR. NGUYEN:  Objection to the narrative,

6  Judge.

7          MR. PHAN:  Well the client trying to share

8  the teaching.

9          THE COURT:  I know what he was trying to say.

10  He's trying to say how wonderful he is.  He needs to confine

11  himself to the answer to the question that you asked him.

12      Q   (By Mr. Phan) Just answer my question.

13          THE COURT:  Let's try it again.

14      Q   (By Mr. Phan) Did you notice any

15  improvement in your children behavior or school

16  performance?

17      A   Yes.  They improve -- their academic is above

18  average.

19      Q   Okay.

20      A   Yes.

21      Q   Okay.  And who is -- do you and your wife share

22  the responsibility of teaching the children, disciplining

23  them or just mainly you?

24      A   It's just me.

25      Q   Why's that?

```
 1        A     Because my wife, she never graduate high school

 2   and she doesn't speak English.  I am the only one

 3   responsible for kids' academic study.

 4        Q     Do both you have a full time job?

 5        A     Yes, we do.

 6        Q     Okay.

 7               MR. PHAN:  No further question, Your Honor.

 8                  C R O S S  E X A M I N A T I O N

 9   BY MR. NGUYEN:

10        Q     So how long have you and -- how long have you and

11   the mother been married?

12        A     Since 2001.  Just right before September 11.

13        Q     Okay.  And you're aware of the allegations of

14   domestic violence between you and your wife?

15        A     Yes, sir.  I am aware of that.

16        Q     Do you dispute that?

17        A     No, I don't dispute that.

18               MR. PHAN:  Objection.  Too general.  Too

19   vague.

20               THE COURT:  Your objection's overruled.

21               MR. PHAN:  The state or the mother herself.

22               THE COURT:  Your objection's overruled.

23        Q     (By Mr. Nguyen) Okay.  You admit there has

24   been domestic violence in the house, correct?

25        A     Yes, sir, between me and my wife.  Not me and the
```

1    kids.

2        Q    Okay.  But you're aware the kids are in the home

3    with you, right?

4        A    That's correct.

5        Q    And even with Mr. Mitchell in the home or whoever

6    else living in the home, do any of them step in to stop the

7    domestic violence between you two?

8        A    No.  Mr. Mitchell only lives there for only two

9    months.  And during that time, there's been no violence.  It

10   just normal family --

11                MR. NGUYEN:  Objection.  Nonresponsive.

12                THE COURT:  Just answer the question that he

13   asked you.

14       Q    (By Mr. Nguyen) Okay.  At any time, have

15   you ever choked your wife in front of the kids?

16       A    Yes, I did.

17       Q    You did?

18       A    I try to choke her but I didn't mean to because I

19   was mad.

20       Q    Okay.  So -- and you're aware that D███████ got

21   into a fight at school, correct?  Yes or no.

22       A    Not in a fight at school.

23       Q    Was he not suspended from school for choking

24   another child?

25       A    Yes, he did.

```
1       Q    Were you aware that he also stated that he learned
2   that from you?
3       A    I don't know that.
4       Q    Okay.
5                MR. CRAIG:  Pass the witness.
6                THE COURT:  Questions?
7                MR. NA:  No questions.
8                MR. CRAIG:  No questions, Your Honor.
9                MR. SPJUT:  No questions.
10               THE COURT:  Next witness.
11               MR. CRAIG:  No witness.
12               MR. NGUYEN:  No, Your Honor.
13               THE COURT:  Anybody else?
14               MR. NGUYEN:  No, Judge.
15               MR. PHAN:  No, Your Honor.
16               THE COURT:  Okay.  Are we done?
17               MR. NGUYEN:  Yes, Judge.
18               THE COURT:  All right then.  T.D.F.P.S. is
19   gonna be named temporary managing conservator.  Current
20   placement's approved.  Now as to -- you're gonna have to
21   work out visitation and things like that.  I'm not gonna get
22   involved in that.  We'll have a -- let's see.
23               MR. NGUYEN:  Status hearing August 18th,
24   Judge.
25               THE COURT:  The next hearing we have is
```

1    August 18th.

2                    MR. CRAIG:  Your Honor, may I ask a question?

3                    THE COURT:  Yeah.

4                    MR. CRAIG:  In the event the mom's new

5    residence where she goes, if that's safe and stable, would

6    it be permissible for me to go out there --

7                    THE COURT:  Oh yeah.

8                    MR. CRAIG:  -- consult with the agency and

9    then move the children without coming back to court?

10                   THE COURT:  Sure.

11                   MR. CRAIG:  Thank you.

12                   THE COURT:  We'd have to --

13                   MR. NGUYEN:  Call a special status.

14                   THE COURT:  -- do something about visitation.

15   Make visitation at a different site.

16                   MR. NGUYEN:  Yes, sir.

17                   THE COURT:  Okay.

18                   MR. NGUYEN:  Not at CPS office?

19                   THE COURT:  Well I'm saying, not at the home.

20                   MR. NGUYEN:  Yes.  Absolutely.

21                   MR. CRAIG:  Thank you, Judge.

22                   MR. NGUYEN:  Thank you, Judge.  Appreciate

23   it.

24

25

APPENDIX 0188

```
1    THE STATE OF TEXAS )

2    COUNTY OF HARRIS   )

3              I, Julia M. Rangel, Official Court Reporter in and

4    for the 314th District Court of Harris County, State of

5    Texas, do hereby certify that the foregoing contains a true

6    and correct transcription of all portions of evidence and

7    other proceedings requested in writing by counsel for the

8    parties to be included in this volume of the Reporter's

9    Record, in the above-styled and numbered cause, all of which

10   occurred in open court or in chambers and were reported by

11   me.

12             I further certify that this Reporter's Record of

13   the proceedings truly and correctly reflects the exhibits,

14   if any, admitted, tendered in an offer of proof or offered

15   into evidence.

16             WITNESS MY OFFICIAL HAND this the 30th day of

17   July, 2015.

18                            JULIA M. RANGEL, Texas CSR 6412
19                            Expiration Date: 12/31/16
                              314th Official Court Reporter
20                            Harris County, Texas
                              1200 Congress, 5th Floor
21                            Houston, Texas 77002
                              713-222-4910
22

23

24

25
```