# EXHIBIT S



REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
CAUSE NO. 2015-03795J

IN THE INTEREST OF            )  IN THE DISTRICT COURT
                             )
D█████ T███ AND P█████ T███   )  HARRIS COUNTY, TEXAS
                             )
CHILDREN                      )  314TH DISTRICT COURT

*********************************

COURT TRIAL

*********************************

On the 23rd day of June, 2016 the following

proceedings came on to be heard in the above-entitled

numbered cause before the Honorable John Phillips, Judge

presiding, held in Houston, Harris County, Texas.

Proceedings reported by Computerized Stenographic

Machine Method.

```
 1                      A P P E A R A N C E S

 2    Mr. DanPhi Nguyen
      SBOT: 16951500
 3    ASSISTANT COUNTY ATTORNEY
      1019 Congress, 17th Floor
 4    Houston, Texas 77002
      Telephone:  713-274-5229
 5    Counsel for T.D.F.P.S.

 6    Mr. Michael Craig
      THE LONGWORTH LAW FIRM
 7    SBOT NO. 24072214
      1385 FM 359 Road, Suite 308
 8    Richmond, Texas  77406-2017
      Telephone:  832-372-7146
 9    Counsel for The Child

10    Mr. Shandon Phan
      ATTORNEY AT LAW
11    SBOT NO. 14052700
      11205 Bellaire Blvd., Suite B-31
12    Houston, Texas  77072
      Telephone:  281-407-5622
13    Counsel for Respondent Father

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X
                        VOLUME 1
 2                    (COURT TRIAL)

 3    June 23, 2016                       Page    Vol.

 4    Announcements.................................  4      1

 5    Motion for Continuance by Mr. Phan............  4      1

 6    Court's Ruling................................  16     1

 7    Petitioner's Witness        Direct      Cross         Vol.

 8    TRANG VU                    19-51                      1

 9      By Mr. Phan                             47           1

10      By Mr. Craig                            48           1

11    WENDELL GILBERT                52                      1

12      By Mr. Phan                             60           1

13    Respondent Father's Witness   Direct      Cross       Vol.

14    TRANG VU                       63                      1

15    Father's Relinquishment Accepted by the Court...  65  1

16    Adjournment...................................  65     1

17    Court Reporter's Certificate..................  66     1

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2                  MR. NGUYEN:  All right, Your Honor.  We are
 3   here at a final trial in the interest of D      and P
 4   T    , cause number 2015-03795J.  Present before the Court,
 5   Mr. Michael Craig is the attorney ad litem for the children.
 6   Mr. Shandon Phan is the attorney for the father Trang Vu who
 7   is present with us today.  D.F.P.S. caseworker, myself
 8   DanPhi Nguyen the Harris County Attorney's Office.
 9                  THE COURT:  That's not everybody that's here.
10                  MR. NGUYEN:  Well these are my witnesses,
11   Your Honor.
12                  THE COURT:  Okay.
13                  MR. PHAN:  Judge, we filed a motion for
14   continuance for good cause and also to protect the
15   respondent right to a fair counsel -- to a fair trial and
16   effective counsel.
17                  THE COURT:  Well now where do you come in?
18   Are you gonna be the effective counsel?
19                  MR. PHAN:  I would need to co-counsel --
20                  THE COURT:  I'm sorry?  You would need what
21   now?
22                  MR. PHAN:  For today, I would be his counsel
23   of record, Your Honor.  But due to the fact that the State
24   allege my client, being a person of interest in the criminal
25   case --
```

```
 1              THE COURT:  Who's the State?

 2              MR. PHAN:  The State?

 3              THE COURT:  Yes.

 4              MR. PHAN:  The county.  CPS.

 5              THE COURT:  You mean you're talking about

 6    like the DA's office?

 7              MR. PHAN:  No.  I'm talking about Mr. DanPhi

 8    Nguyen representing CPS.

 9              THE COURT:  He represents CPS.  And you do

10    realize he has no criminal jurisdiction.

11              MR. PHAN:  Correct.  But they do bring in the

12    criminal element base on the entire provocation that my

13    client --

14              THE COURT:  He may inadvertently offend your

15    client too.  What would you suggest would be the --

16              MR. PHAN:  Well that's not --

17              THE COURT:  -- right thing to do if he's,

18    let's say, made allegations that simply offended your

19    client?  Would that be a bad thing, too?

20              MR. PHAN:  I don't object that.  I totally

21    accept that.

22              THE COURT:  Well I trust that he won't do

23    that.

24              MR. PHAN:  I'm asking the Judge to consider

25    the fact that throughout the first half of the case --
```

1          THE COURT:  I'm sorry?

2          MR. PHAN:  Throughout the first half of the

3   case, we have up grade based on the assumption that my

4   client finish every term of the family service plan, family

5   reunification.

6          THE COURT:  That's a good thing though,

7   right?  If he finished the service plan?  That's --

8          MR. PHAN:  That would be satisfactory.

9          THE COURT:  That would be a good thing.

10          MR. PHAN:  Yes, Your Honor.

11          THE COURT:  You would think you would want to

12   strike while the iron was hot on that one.  In case he, you

13   know, relapsed or something, you know in the interim.

14          MR. PHAN:  Well --

15          THE COURT:  If you were to be granted a

16   continuance, let's say.  A relapse is a bad thing.  It could

17   happen.

18          MR. PHAN:  We did not discover that three key

19   witnesses who can show H.P.D. investigation was, in fact,

20   totally inaccurate.  For example, a --

21          THE COURT:  What do you mean you didn't

22   discover?

23          MR. PHAN:  For example --

24          THE COURT:  Well no, no.  What I want to know

25   is -- I mean the case, you know, started in over -- quite a

```
 1    year ago, almost a whole year.
 2                    MR. PHAN:  Yes, Your Honor.
 3                    THE COURT:  And the statute provides for a
 4    year for people to do whatever they need to do to be
 5    rehabilitated, be reunited, which is, you know, something I
 6    think is a good goal.
 7                    MR. PHAN:  Well we met many times.
 8                    THE COURT:  But when you say, we didn't
 9    discover it, I mean do you want me to -- I mean I need to
10    understand who is we?
11                    MR. PHAN:  The respondent.
12                    THE COURT:  The respondent.  So you're
13    blaming it on the respondent?
14                    MR. PHAN:  No, the respondent --
15                    THE COURT:  The respondent.
16                    MR. PHAN:  We met many times.
17                    THE COURT:  The respondent failed to discover
18    something that you felt like --
19                    MR. PHAN:  Because he didn't know, Your
20    Honor.  He didn't know what other witnesses said to the --
21                    THE COURT:  So I guess my next question would
22    be, what did he do to try to determine who those witnesses
23    were?
24                    MR. PHAN:  Well accident.  Not by his own
25    effort.
```

```
 1                    THE COURT:  I mean.
 2                    MR. PHAN:  I had recently --
 3                    THE COURT:  Did anybody that -- you're aware
 4     of, did anybody intentionally mislead this person or block
 5     this person from information that would have, you know,
 6     given him the names of witnesses?
 7                    MR. PHAN:  You're talking about my client
 8     Mr. Vu?
 9                    THE COURT:  You know what I'm trying to do is
10     just answer your questions and have a dialogue with you
11     about it.
12                    MR. PHAN:  Yes, Your Honor.
13                    THE COURT:  You understand?
14                    MR. PHAN:  So what happened was, there was
15     this lady who came into my office and -- to ask me to do
16     another legal service for her.  But through the interaction,
17     I discover that this was somehow involved in this business,
18     which I never have knowledge of.  And she told me that she
19     was the person that discovered the body of the decedent.
20     Now on the police report, throughout the whole process,
21     H.P.D. maintained that my client have -- was the first
22     person discover that.  Given that on something so
23     fundamental and basic is that they make a mistake.
24                    THE COURT:  What is so fundamental and basic?
25     Seems pretty ordinary to me that, you know --
```

1          MR. PHAN:  Well the fact that if they
2   accusing my client of being a suspect or having anything to
3   do with the mother, his wife, it was robbery of his store.
4   The testimony of the business partner who was there on that
5   day who witnessed potential suspects several times.  It was
6   a Vietnamese nail salon demonstration conducted entirely in
7   Vietnamese language.  Yet there was sound -- or African
8   American male visiting the store several time during the
9   day.  None of those facts were shown on investigation
10  report.
11          MR. NGUYEN:  Your Honor, I would object to
12  counsel testifying.
13          THE COURT:  Well let him talk.  He's all
14  right.
15          MR. NGUYEN:  Okay.
16          THE COURT:  Go ahead.
17          MR. PHAN:  And when there are these key
18  witness who are living -- two living out of the state and
19  one is currently in Vietnam on vacation are willing to
20  testify on my client behalf.  That they suspect those
21  individuals was shopping the event.  They have every --
22  there was every reason to suspect that there was a lot of
23  cash on that day.  They were conducting a class attracting
24  over 25 students.  Each student pay cash to attend the
25  class.  How would an event conducted in Vietnamese to

1   Vietnamese community on nail techniques and products attract

2   three African American male to visit the store and ask

3   them --

4                    THE COURT:  How would it -- you're, you know,

5   I'm not sure who built the pyramids.  I mean you're asking

6   me to answer a question that I don't know that anybody has

7   the answer.  Obviously --

8                    MR. PHAN:  Well I think there was other fact

9   that --

10                    THE COURT:  Well I understand what you think.

11                    MR. PHAN:  Other parties try to draw

12   conclusion in this.

13                    THE COURT:  What you think, you know,

14   that's --

15                    MR. PHAN:  Judge, you asking my client by

16   himself, with very limited financial resources.  He lost his

17   business.  He lost his wife.  He lost his children.  He lost

18   his home.

19                    THE COURT:  Well I'm really sorry about that.

20                    MR. PHAN:  He didn't have the means to

21   fight --

22                    THE COURT:  I don't have anything extra

23   really either.  I don't know what you --

24                    MR. PHAN:  Well my point is --

25                    THE COURT:  I like it that you started into

```
 1    some facts and now you've kind of brought yourself to the
 2    emotional appeal and that's --
 3                    MR. PHAN:  No, it's not emotional appeal,
 4    Your Honor.
 5                    THE COURT:  I want to hear your entire
 6    spectrum but --
 7                    MR. PHAN:  Which, Your Honor --
 8                    THE COURT:  -- I'm having a hard time
 9    developing agreement, but I'm trying.
10                    MR. PHAN:  Okay.  Thank you for the
11    opportunity.
12                    THE COURT:  So can you summarize very briefly
13    why this case should be --
14                    MR. PHAN:  Continued.
15                    THE COURT:  -- continued?
16                    MR. PHAN:  Yes, Your Honor.
17                    THE COURT:  Because I haven't heard it yet.
18                    MR. PHAN:  Yes.  There are different arrows
19    pointing at my client --
20                    THE COURT:  Uh-huh.
21                    MR. PHAN:  -- for the previous domestic
22    violence.
23                    THE COURT:  Well now that would be pretty
24    normal --
25                    MR. PHAN:  Correct.
```

1          THE COURT:  -- if he was alleged by CPS to

2   have done something either to a person, a mother of the kids

3   or whatever that resulted in maybe the removal of kids; and

4   then the case develops and certain facts exist or don't

5   exist and then we get down to a final hearing.  And then you

6   come up and say, well you know, I don't know that if that's

7   right, because gosh, the facts may have developed to the

8   extent that other people think he may have been more than

9   just involved in a CPS case and somehow that's supposed to

10  prevent our CPS case.  So I don't know.

11          MR. PHAN:  Because the plan, the stated plan

12  on record --

13          THE COURT:  The what?

14          MR. PHAN:  The state --

15          THE COURT:  The state had what?

16          MR. PHAN:  The CPS goal on record was for

17  family reunification.

18          THE COURT:  Well now CPS is -- you know,

19  they're important in these cases because they bring the

20  petition but they don't make the decisions.  It's not even

21  really necessary, in my mind, that they state a goal.

22  Although I think it's a fair thing because it gives people,

23  kind of -- parents notice of what they maybe need to do or

24  where they have failed and where they need to pick it up.

25  But it has no real influence on me.

1          MR. PHAN:  I agree with that.  But then the

2 reason why they agree to family reunification was because

3 there was no injury to the children.  None.  There was no

4 recent domestic violence incidents.

5          THE COURT:  Well you're starting to waste our

6 time right now, making your final argument.  Because when

7 you say things like, there's no injury to the children, you

8 must think that I'm dumb enough to think that the only

9 injuries to a child would be a physical injury.

10         MR. PHAN:  I agree that's mental and

11 emotional.

12         THE COURT:  I think you were doing well for a

13 while there and now you're not doing as well.

14         MR. PHAN:  I'm sorry, Your Honor.  I'm

15 trying.

16         THE COURT:  I'm gonna give you another minute

17 or two to convince me that the case should be continued, but

18 if I were you, I'd get right to the point.

19         MR. PHAN:  Yes, sir.  There are three key

20 witnesses.

21         THE COURT:  And here's the thing.  If you

22 have a couple things, you better start with the best one

23 first.

24         MR. PHAN:  Yes.  There are three key

25 witnesses.  Two of them business partners who know both the

1    incident and the husband inside out.

2                    THE COURT:  So whatever happened in this

3    family that caused the children to be removed by CPS, these

4    people were eye witnesses to these?

5                    MR. PHAN:  Correct, Your Honor.

6                    THE COURT:  So they were in the home.

7                    MR. PHAN:  Yes.

8                    THE COURT:  And they provided statements to

9    CPS that something happened that didn't happen.

10                   MR. PHAN:  Yes.

11                   THE COURT:  Is that what you're trying to

12   say?

13                   MR. PHAN:  Yes, they know the family.

14                   THE COURT:  I don't see that in here.  Now

15   what else?  That was your best one now.  Remember it has to

16   be the best one.

17                   MR. PHAN:  Yes.

18                   THE COURT:  Okay.

19                   MR. PHAN:  They can also testify that they

20   are the ones who advise both the decedent and Mr. Vu to file

21   for divorce as a trick against CPS.

22                   THE COURT:  Okay.  Now here's the problem you

23   have.  And this is the last time I'm gonna explain what your

24   problems are.  See if what you said were true, I'm not gonna

25   doubt you because I'm gonna presume that you're an honored

1    member of the bar.  But if what you said were true, those

2    facts and circumstances and knowledge on the part of those

3    people existed at the very beginning of the case.

4              MR. PHAN:  Yes.

5              THE COURT:  And any decent preparation would

6    have included those people for the final hour which we are

7    here today.

8              MR. PHAN:  Your Honor --

9              THE COURT:  Now I think you're gonna learn a

10   lot more by listening than you are by talking.  You haven't

11   done so good so far by talking.  So what I'm telling you is

12   that if the people were there in the inception of the case

13   and they were known to be important, then there was ample

14   opportunity to make sure they were there.  So -- at the

15   final where we are today.  And they're not.  And you want to

16   make some allowance for that, which seems that it can only

17   be through some fault of the person who claims they need

18   them the most.  Now if they went missing or if they were in

19   a car wreck and incapacitated or something, I might feel a

20   little more inclined to go with you.

21             MR. PHAN:  And on top of that, also two

22   witness can testify that they saw potential suspects on that

23   day.

24             THE COURT:  You know you keep telling me what

25   witness can testify but you can't seem to tell me why you

```
 1   don't have them here ready to testify.  Here's the deal.
 2                   MR. PHAN:  Well I can explain to Your
 3   Honor --
 4                   THE COURT:  Whatever your request is, is
 5   officially denied.  Now are you ready to go forward today?
 6                   MR. PHAN:  Can I have my last --
 7                   THE COURT:  Can you have your what?
 8                   MR. PHAN:  -- request?  Can I have my last
 9   request?
10                   THE COURT:  Your request is denied.  I've
11   heard everything you have to say.
12                   MR. PHAN:  Okay.  Thank you, Your Honor.
13                   THE COURT:  Okay.  Is everybody ready to go
14   forward?
15                   MR. CRAIG:  Ready, Judge.
16                   MR. PHAN:  Yes, sir.
17                   THE COURT:  All right.
18                   MR. NGUYEN:  Offering what's marked as P1.
19   This is the --
20                   THE COURT:  We have all the parties?
21                   MR. NGUYEN:  Yes, Your Honor.
22                   THE COURT:  Let's go through it again.  I was
23   listening to you and not marking everybody down.  We got --
24                   MR. NGUYEN:  Mr. Michael Craig ad litem for
25   the children.  Mr. Shandon Phan attorney representing the
```

```
 1   father.
 2                  THE COURT:  Representing who, just the
 3   father?
 4                  MR. NGUYEN:  Of -- just the father.
 5                  THE COURT:  Okay.  Is there a mother in the
 6   case?
 7                  MR. NGUYEN:  Mother's deceased.
 8                  THE COURT:  Mother's deceased.  Okay.
 9                  MR. NGUYEN:  My witnesses, Officer Gilbert
10   and Ms. Judy Nguyen.
11                  THE COURT:  And you, sir?
12                  SPEAKER:  I'm just kind of shadowing him.
13                  THE COURT:  Shadowing.
14                  SPEAKER:  Yes.
15                  MR. NGUYEN:  Ms. Judy Nguyen, she's the
16   children's therapist.
17                  THE COURT:  Children's therapist.  Very good.
18   All right.  Here we go.
19                  MR. NGUYEN:  P1 is the citation for the
20   father.
21          P2 is the birth certificate of the child.  P2 and
22   P3 are the birth certificates of the children.
23          P4 and P5 are the certificates of continuing
24   jurisdiction.
25          P6 and P7 is the DNA test for Mr. Trang Vu.  He is
```

1    the father of both kids.

2         P8 is the family service plan for Mr. Vu.

3         P9 is the status hearing order ordering the family

4    service plans.

5         P10 is Mr. Vu's Four C's assessment.

6         P11 is a sworn affidavit written by Ms. Tran, the

7    deceased mother, in anticipation of applying for protective

8    order.  That's P11.

9         P12 is the mother's autopsy report indicating time

10   of death was 8:40 p.m. on July 20th, 2015.

11        P13 is the certified copy of the show cause

12   hearing transcript.

13        And I will hold on to the other exhibits.  I'll

14   prove them along with my witnesses.

15             MR. CRAIG:  No objection, Your Honor, to any

16   of the exhibits offered.

17             THE COURT:  What was the last one, 14?

18             MR. NGUYEN:  Thirteen, Your Honor.

19             THE COURT:  Okay.

20             MR. NGUYEN:  I'm gonna hold on to the other

21   exhibits to prove it up through my witnesses.

22             THE COURT:  Ready when you're ready.

23             MR. NGUYEN:  At this time, Judge, I'd like to

24   call Mr. Vu.  Sir, please step forward.

25

```
 1                    TRANG VU
 2          Having first been duly sworn, testified as
 3    follows:
 4               D I R E C T   E X A M I N A T I O N
 5    BY MR. NGUYEN:
 6          Q     State your name.
 7          A     My name's Trang Vu.
 8          Q     Okay.  And you understand why you're here before
 9    the Court today, correct?
10          A     Yes, sir, I do.
11          Q     You've gone through your Four C's evaluation, yes?
12          A     Yes, sir, I did.
13          Q     Okay.
14          A     I went into --
15               MR. NGUYEN:  I object to nonresponsive.
16          Q     (By Mr. Nguyen) And you've acknowledged
17    the fact that there's been ongoing physical abuse
18    against -- between you and the mother, correct?
19               MR. PHAN:  Objection.  Assuming facts not in
20    evidence.
21               THE COURT:  Objection's overruled.
22          Q     (By Mr. Nguyen) You acknowledge that,
23    correct?
24          A     We have disagreement about --
25               THE COURT:  Here's what --
```

1        MR. NGUYEN:  Objection.

2        THE COURT:  You hang on a second.  Now here's

3   your obligation today.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  I don't think anybody's gonna

6   grab you by the feet and turn you upside down and make you

7   do it.  But when you're asked a question, if you can answer

8   it yes or no, I strongly suggest you do that.  If you want

9   to go off into the weeds with an answer that really ain't

10  gonna help anybody and waste time, probably gonna limit your

11  time here.

12       THE WITNESS:  Yes, Your Honor.

13       THE COURT:  You understand that, don't you?

14       THE WITNESS:  Yes, Your Honor.  But he said I

15  abused --

16       THE COURT:  There you go.  Off in the weeds.

17       MR. PHAN:  Just yes or no.

18       THE COURT:  Now if you want to remain in

19  here, this is an important day for you.  It's your final

20  hearing.

21       MR. PHAN:  Yes, Your Honor.

22       THE COURT:  And I want you to fully

23  participate.

24       THE WITNESS:  Yes, Your Honor.

25       THE COURT:  But if for some reason you don't

```
 1    think you can follow the rules or decorum of the Court, I'm
 2    just happy for you to be outside and you can find out what
 3    happens when it's all over.
 4                   THE WITNESS:  I'm sorry.
 5                   THE COURT:  Well good for you.  Now let's go.
 6        Q    (By Mr. Nguyen) Sir, you admit there was
 7    an ongoing domestic violence between you and your
 8    wife while she was alive, correct?
 9        A    No, sir.
10        Q    You don't acknowledge that?
11        A    No, sir.
12        Q    So what your statements in the Four C's evaluation
13    where you beat the mother over the head with the leg of a
14    chair, that's not a true statement?
15        A    It is a true statement.
16        Q    Okay.  So that means your first statement was a
17    lie, yes?
18        A    It happened ten years ago.  It's not ongoing, sir.
19        Q    Okay.
20        A    I did make a mistake on that.  I saw it.  But it's
21    not --
22        Q    So you're not acknowledging to any recent, as of
23    last year, any domestic violence between you and your wife.
24        A    No, sir.
25        Q    Okay.  You never threw a chair at her?  Is that
```

```
 1    what you state?

 2         A    I did that ten years ago.

 3         Q    Ten years ago?

 4         A    Yes, sir.

 5         Q    Okay.  That's not what is stated in your Four C's

 6    evaluation.  You admitted to that --

 7                   MR. PHAN:  Objection.  Argumentative.

 8                   THE COURT:  Overruled.

 9         Q    (By Mr. Nguyen) Okay.  Did you ever

10    threaten to hit your wife and then she fell down the

11    stairs?

12         A    No, sir.

13         Q    That never happened?

14         A    She fell down the stairs.

15         Q    Yeah.  After you raised your hand at her, correct?

16         A    No, sir.

17         Q    Oh no?

18         A    No.

19         Q    Then how did she fall down the stairs?

20         A    We were arguing about a business, something, I

21    don't remember what it was.

22         Q    Oh really?  So you never raised your hand like

23    this in that respect?

24         A    And she -- no, I did not.

25         Q    Oh yeah?
```

```
 1        A     And she had socks on that morning.

 2        Q     Okay.  Did you try to help her up?

 3        A     I did.  I went downstair.  I try.

 4        Q     Okay.

 5        A     She fell down.  She went down stair and I told

 6  her.  She did -- that was wrong.  And she fell down the

 7  stair on her own.  I did not push --

 8                    MR. NGUYEN:  Objection.  Nonresponsive.

 9                    THE COURT:  Yeah.  That's sustained.

10                    MR. NGUYEN:  Sir, did I get P1 through P13

11  were admitted, Judge?

12                    THE COURT:  I'm sorry?

13                    MR. NGUYEN:  P1 thru P13 were admitted?

14                    THE COURT:  Yeah.

15        Q     (By Mr. Nguyen) All right.  At any point

16  during the ongoing domestic violence between you and

17  your wife, did your children ever have to jump in to

18  stop you?

19        A     There were arguments in the family.

20                    MR. NGUYEN:  Objection.  Nonresponsive.

21                    THE COURT:  Here you go.  You got one more

22  chance.  Patience is running out with you.  I don't care

23  what you think this is, this is a court proceeding.  You're

24  being asked questions.  You're gonna answer yes or no if you

25  can and I'm not gonna hear anymore of your explanations.
```

```
 1   You've got a lawyer there.  If he wants to help you make

 2   some other kind of excuse or explanation, you better wait

 3   for him.  You do it one more time, you're outside the

 4   courtroom.  You understand?

 5                   THE WITNESS:  Yes, sir.

 6                   THE COURT:  I'm not gonna tell you again.

 7                   THE WITNESS:  Yes, sir.

 8                   MR. PHAN:  Your Honor, may I have five

 9   seconds to instruct him?

10                   THE COURT:  Yeah, you may.

11       Q    (By Mr. Nguyen) Okay.  So you stated

12   earlier that the whole chair throwing thing, that

13   occurred ten years ago?

14       A    Yes, sir.

15       Q    Okay.

16                   MR. PHAN:  Asked and answered.  Objection,

17   Your Honor.

18                   THE COURT:  Overruled.

19       Q    (By Mr. Nguyen) All right.  Have you ever

20   choked your wife?

21       A    No, sir.

22       Q    Never?

23       A    No, sir.

24       Q    Okay.  You understand that your wife applied for a

25   protective order against you, correct?
```

```
 1      A     No.  I'm not aware of that.

 2      Q     You're not aware of that?

 3      A     No, sir.

 4      Q     Do you know about this sworn affidavit that your

 5  wife wrote a couple weeks before she passed away, where she

 6  alleged February 2015, that you choked her in a parking lot?

 7  That you didn't like the advertising postcards that you

 8  did -- that she did for the business?

 9      A     No, sir, I did not.

10      Q     You did not?

11      A     No, sir.

12      Q     You did --

13      A     No, sir.

14      Q     Okay.  Did she ever spit or throw up in the

15  parking lot and then you beat her afterwards?

16      A     Yes.  She did spit in the parking lot.

17      Q     Okay.  And you beat her as a result, correct?  You

18  got mad at her that day; isn't that true?

19      A     Yes, I did got mad at her.

20      Q     Okay.  You even beat her in the back of the

21  office; is that true?  The back of the business.

22      A     I did hit her that time, yes, sir.

23      Q     You did?

24      A     Yes, sir.

25      Q     So that was less than ten years ago.  That was
```

```
 1   recent, right?  That was recent?
 2        A    Because I was --
 3                  MR. NGUYEN:  Objection.  Nonresponsive.
 4        Q    (By Mr. Nguyen) Was that recent?
 5        A    I don't remember what date that was.
 6        Q    How long have you had your business?
 7        A    About two years.
 8        Q    Two years ago.  So that's less than ten years ago,
 9   right?  Yes?
10        A    Ten years ago, I hit her with a broken chair.
11        Q    Okay.  So within the last two years, you hit your
12   wife in the business how many times?
13        A    One time.
14        Q    One time?
15        A    Yes, sir.
16        Q    Okay.  Just one time in the business?
17        A    In the business, yes, sir.
18        Q    Okay.  But a couple few more times at home then,
19   right?
20        A    No, not at home.
21        Q    Oh okay.
22        A    No, sir.  But I --
23                  MR. NGUYEN:  Objection.  Nonresponsive.
24        Q    (By Mr. Nguyen) Now in fact, the mother
25   seems to allege that this occurred in May of 2015.
```

1    Isn't that true?

2         A    I don't remember.

3         Q    When the mother threw up in the parking lot and

4    then you ended up beating her afterwards?

5         A    No, I didn't.

6                   MR. PHAN:  Objection.  Asked and answered.

7                   THE COURT:  Overruled.

8         Q    (By Mr. Nguyen) Your niece had to call the

9    police, didn't she?  The police were called out to

10   the business?

11        A    Yes.  The police did come.

12        Q    All right.  November 2014.  You were choking and

13   hitting your wife because you -- because she cooked raw food

14   for you; is that a true statement?

15        A    No, sir.  No, sir.

16        Q    Okay.  So whatever statement that the mother made

17   in this affidavit is a lie?

18        A    That's correct.

19        Q    Okay.  And then the kids had to intervene in the

20   process.  They said, Daddy, please don't do that.  This is

21   back in November 2014?

22        A    I don't remember but I remember the kids did.

23        Q    Is that because these incidents just happened so

24   often you just don't know which incident was which?  Yes?

25   These happen pretty often, don't they?

```
 1      A     It happened several times.

 2      Q     Several times.

 3      A     Yes, sir.

 4      Q     Not just one time.  Several times.

 5      A     Yes, sir.

 6      Q     One time in the business maybe several times at

 7   home, correct?

 8      A     Yes, sir.

 9      Q     Choking?  Slamming her into the wall?

10            MR. PHAN:  Objection.  Asked and answered.

11      Q     (By Mr. Nguyen) Throwing chairs at her?

12            MR. PHAN:  Objection.  Badgering the witness.

13            THE COURT:  Overruled.

14      Q     (By Mr. Nguyen) Ten years ago.  That's not

15   what you testified earlier.

16      A     In the packing lot --

17            MR. NGUYEN:  Objection.  Nonresponsive.

18            THE COURT:  Get to your next question.  Let's

19   go.

20            MR. NGUYEN:  Yes, Your Honor.

21      Q     (By Mr. Nguyen) So about your children,

22   we'll get off the domestic violence part for a

23   second.  About your children.  Have you ever hit

24   your children?

25      A     No, sir.
```

1    Q    No, sir.  Okay.  Well that's not what you said at

2  the show cause.  The show cause hearing, this is the first

3  hearing that we came to court.  Do you remember?  Let me

4  refer back to this portion of the transcript where you said,

5  yes, of course I hit them.  It's just so they can be

6  disciplined and they can do well in school.  Oh you remember

7  now?

8    A    Yes.

9    Q    Yeah.

10   A    I did hit them but not hitting like hurt them.

11   Q    Oh really?

12   A    I just like discipline them.

13   Q    Oh okay.  So does disciplining them require

14  hitting your daughter over the head with a soda can because

15  she refuses to wear a Muslim scarf for school?

16   A    No, sir.  I did not do that.

17   Q    Really?  That's a lie?

18   A    Yes, sir.

19   Q    If your daughter made that outcry, that would be a

20  lie.

21   A    Yes, sir.

22   Q    So how do you explain the bruise that was found on

23  her head that day?

24   A    There was no bruise, sir.

25   Q    Okay.  Have you ever tried to inflict fear on

```
1    them?

2         A    No, sir.

3         Q    Never?

4         A    No, sir.

5         Q    Have you ever tried to wave a BB gun in their

6    general direction?

7         A    No, sir.

8         Q    Never?

9         A    No, sir.

10        Q    So at one point, when they were like nine or

11   ten --

12        A    I --

13                  MR. NGUYEN:  Objection.  Nonresponsive.

14                  THE COURT:  Just answer the question asked.

15        Q    (By Mr. Nguyen) At one point, did you like

16   waive a BB gun in their general direction and they

17   ran off to the neighbor's house?

18        A    No, sir.

19        Q    Never?

20        A    No, sir.

21        Q    When they were nine or ten?

22        A    No, sir.

23        Q    So that's a lie?

24        A    Yes, sir.

25        Q    Okay.  Your children were lying?
```

```
 1        A    Yes, sir.

 2        Q    Okay.  So what about the time when you found out

 3   they were lying about doing their homework and then you

 4   drove them to -- close to a river and then took an ax out

 5   threatening to kill them?

 6        A    No, sir.

 7        Q    Really?

 8        A    No, sir.

 9        Q    That never happened?

10        A    No, sir.

11        Q    All right.  And this is -- this could have

12   happened around like when they were ages nine or ten; fourth

13   or fifth grade?

14        A    It never happens to the kids.

15        Q    It never happens.  But you used it as a scaring

16   tool, correct?

17        A    No.

18        Q    You like to inflict fear on them?

19        A    No, sir.

20        Q    Never?

21        A    No, sir.

22        Q    Okay.  So you do acknowledge you hit your wife

23   over the head before with the leg of a chair, correct?

24        A    No.  No, sir.

25        Q    Never?
```

```
 1        A      No, sir.

 2        Q      Okay.  So let's talk about the evening your wife

 3   passed away.  Now prior to that, you met with Ms.  Kelly

 4   Armstrong?

 5        A      Yes.

 6        Q      She was the first conservatorship worker.

 7        A      Right.

 8        Q      And she was discussing with you about your family

 9   service plan?

10        A      Yes, sir.

11        Q      And she also discussed about the high possibility

12   that the children were gonna be -- likely be returned home

13   to your wife.

14        A      Yes.  Yes, we talked about that.

15        Q      How did that make you feel?

16        A      Good.

17        Q      It made you feel good?

18        A      Yes, sir.

19        Q      Well would it surprise you to know that your --

20   that we've been told that you were extremely angry, very

21   enraged that evening -- that afternoon?

22                    MR. PHAN:  Objection.  Assuming facts not in

23   evidence.

24                    THE COURT:  Overruled.

25        Q      (By Mr. Nguyen) Were you mad that day?
```

```
 1        A      About what?

 2        Q      About the fact that your children could go back

 3   home to the mother and not you.

 4        A      No.

 5        Q      No?

 6        A      No, sir.

 7        Q      No?

 8        A      No, sir.

 9        Q      This occurred early around 3:00 p.m., correct,

10   this conversation, 3:00 p.m. in the afternoon with the

11   caseworker?

12        A      We had discussions with the caseworker.

13        Q      How did that discussion go?  Tell me.

14        A      Several meetings.  And we had plan with the

15   caseworker to return the kids back to us.

16        Q      Okay.  You didn't scream at her?

17        A      No, sir.

18        Q      You didn't say no one can ever take care of my

19   kids better than me?

20        A      Yes, I did say that.

21        Q      You did say that?

22        A      Yes.

23        Q      My wife can never take care of my kids better than

24   me.  Isn't that what you said?  That is what you said, yes?

25        A      I believe I say that.
```

```
 1        Q    Okay.  So the whole idea of your wife getting the

 2   kids and not you, that infuriated you, didn't it?

 3        A    No, sir.

 4        Q    No?

 5        A    No, sir.

 6        Q    You were okay with that?

 7        A    Yeah.  I'm okay with that.

 8        Q    How did you feel when your wife filed for divorce?

 9        A    That was a plan that you don't understand.

10        Q    Okay.

11        A    How do I feel --

12             MR. NGUYEN:  Objection.  Nonresponsive.

13   Okay.

14             MR. PHAN:  Objection, Your Honor.  The

15   witness was answering the question and Mr. Nguyen didn't

16   allow the witness --

17             MR. NGUYEN:  I believe he answered it.

18             THE COURT:  Move along.

19             MR. NGUYEN:  All right, Your Honor.

20        Q    (By Mr. Nguyen) So then -- so that

21   conversation with the caseworker took place on

22   July 20th, correct?

23        A    I don't remember.

24        Q    Okay.  That day, then you -- I don't know if you

25   went back to work or you went back to the salon where your
```

```
 1   wife worked, correct?

 2        A    I don't -- I don't remember what I did on that

 3   day.

 4        Q    You don't remember.  Well do you remember the day

 5   your wife died?

 6        A    Yes, sir, I do.

 7        Q    Okay.  So you know that -- you admit that you were

 8   there the night before.  Yes?

 9        A    The night before she died?

10        Q    The night she died.

11        A    I was there, yes.

12        Q    You were there?

13        A    Yes, sir.

14        Q    Okay.  What time did you leave the salon?

15        A    About 7:00, 8:00 o'clock.

16        Q    7:00 or 8:00 --

17        A    I don't remember but it's late in the evening.

18        Q    7:00 or 8:00 o'clock.

19        A    It was late in the evening.

20        Q    Late in the evening.  And your business hours open

21   until what time at that time?

22        A    About 7:00 and 8:00 o'clock.

23        Q    Okay.  What were you doing there?

24        A    I was there helping clean up the show that we had,

25   the beauty show that we had on that day.
```

1      Q    Okay.

2      A    After work, I went to my wife store to help her

3  clean up the place.

4      Q    All right.  And did you wait for her?

5      A    After I clean up the place?

6      Q    Yeah.

7      A    No, sir, I didn't.

8      Q    Why didn't you wait for her?

9      A    Because everybody left the store.  And she leave

10  the store go back to her friend's house and I go back to my

11  house.

12     Q    Okay.  Your friend Cindy, right?

13     A    Yes, sir.

14     Q    Okay.  How is Cindy related to you or her?

15     A    She's a friend.

16     Q    She's a friend?

17     A    And also a business partner.

18     Q    Business partner of the salon?

19     A    Yes.

20     Q    So during that time, you and your wife were

21  separated, correct?

22     A    Yes.

23     Q    Okay.  And it was your understanding that your

24  wife was gonna go home to Cindy's house.

25     A    Yes, sir.

```
 1        Q     And Cindy, at any point -- didn't Cindy call you

 2   and let you know she never made it home?

 3        A     Yes, sir, she did.

 4        Q     So she did tell you that?

 5        A     Yes.

 6        Q     When did she tell you?

 7        A     She called me about -- I think 1:00 o'clock.  1:00

 8   a.m.

 9        Q     1:00 a.m.?

10        A     Yes, sir.

11        Q     Okay.  What did you do after that?

12        A     I continue working on my computer, pay bills on my

13   computer.

14        Q     So it didn't concern you that your wife didn't

15   come home?

16        A     Yes.  I told Cindy that.  Yes.  She usually stay

17   with you but she didn't come home, she stay at Anna's house.

18        Q     Did you confirm that?

19        A     No.  I didn't call Anna's house.

20        Q     So you weren't really concerned, were you?

21        A     Yes.

22              MR. PHAN:  Objection.  Argumentative.

23        A     Yes.

24              THE COURT:  Overruled.

25        Q     (By Mr. Nguyen) How do you know she was at
```

1    Anna's house?  You didn't confirm it?

2         A    Because Anna and Cindy are her best friend.

3         Q    Okay.

4         A    I think her best friends.

5         Q    If that were the case, then Anna would have called

6    you and told you that she didn't make it home.

7         A    But I didn't call Anna.

8              MR. PHAN:  Objection.

9         Q    (By Mr. Nguyen) Did you try to call your

10   wife at all --

11        A    I did --

12        Q    -- to confirm where she was?

13        A    -- call my wife.

14        Q    How many times throughout the night did you try to

15   call your wife?

16        A    Several times.

17        Q    Several times?

18        A    Yes, sir.

19        Q    Did you go to sleep that night?

20        A    Yes, I went to sleep.

21        Q    Okay.  And the last time you saw your wife was

22   where?

23        A    The last time?

24        Q    Yes.

25        A    At that nail -- at the business place.

1    Q    Okay.  So wouldn't a reasonable husband think of

2  actually going back to the last place where he saw the wife?

3    A    I did not go back.  I continued working on the

4  computer paying bill and I didn't go back to the store.

5    Q    Oh okay.  And your wife's body was discovered the

6  next morning?

7    A    Yes, sir.

8    Q    Right?  Not you.  Someone else, correct?

9    A    That's correct.  My friend call me.

10    Q    Okay.  And you stated that you made several

11  attempts to call your wife.  Did she answer?

12    A    No, she didn't answer.

13    Q    And so that didn't, like raise a red flag to you?

14  Like oh my wife's missing?

15    A    I left --

16           MR. PHAN:  Object.  The witness already

17  testified that there was --

18           THE COURT:  Your objection's overruled.

19    A    I left her voice message.

20           MR. NGUYEN:  Objection.  Nonresponsive.

21           THE COURT:  Just answer the question.

22    A    Yes, sir.

23    Q    (By Mr. Nguyen) You left her several voice

24  messages?

25    A    Yes, sir.

```
 1        Q    But the fact that -- did she ever return those

 2    calls?

 3        A    No, she didn't call me back.

 4        Q    Right.  Because she was dead then, yes?

 5        A    I don't know.

 6                  MR. PHAN:  Objection.  Your Honor.

 7    Argumentative.

 8                  THE COURT:  Objection's overruled.

 9        Q    (By Mr. Nguyen) Okay.  So the fact is --

10    the fact of the matter is, you called her several

11    times, left voice messages, she never called you

12    back.  You didn't hear from her the rest of the

13    whole night and you did nothing about it?

14        A    I call.  I tried to contact her.

15        Q    Okay.

16        A    But she didn't call me back and I left her voice

17    message.  That's all I did.

18        Q    Okay.  That's all you did?

19        A    Yes, sir.

20        Q    You live on the 9226 Sand Stone, correct?

21        A    Yes, sir.

22        Q    All right.  That's driving distance.  That's six

23    minutes away from the business, correct?

24        A    Yes, sir.  Correct.

25        Q    Okay.  It would not be an inconvenience to you,
```

 1    for you to take a drive over there and see where she was if

 2    she was still there?

 3        A    Yes, I could have went back to the store.

 4        Q    But you didn't do that, did you?

 5        A    No, sir, I didn't.

 6              MR. PHAN:  Objection, Your Honor.  Asked and

 7    answered.

 8              THE COURT:  Your objection's overruled.

 9        Q    (By Mr. Nguyen) Because you already knew

10    she was dead; isn't that true?

11        A    No, sir.

12        Q    Now what was the basic theory that you thought

13    could have happened to your wife?

14        A    At, I think at 12:00 o'clock, no at 11:00 o'clock,

15    another friend of her call me.  She wants me -- okay.

16    Where's your wife.  I want to buy some product at the store.

17        Q    At 11:00 o'clock p.m.?

18        A    Yes, sir.  And she call me and I told her, well

19    the business -- the show is over.  It's closed.  Everybody

20    left the store.  Nobody's at the store.  And she say that,

21    well she at the store.  And I told her well it's closed.

22    And then there's nobody there.  And she went home.  She told

23    me she want to buy some product that she was waiting for my

24    wife.  She went home.  I think she went home.

25        Q    Okay.

```
 1        A     So I think maybe my wife at that point, she went

 2   back to the store by herself at night, at 11:00 o'clock at

 3   night.

 4        Q     Okay.

 5        A     By herself.

 6        Q     By herself?

 7        A     And that's when they attack her at night.

 8        Q     All right.  At -- I mean you remember Officer

 9   Gilbert?

10        A     Yes, sir, I remember.

11        Q     During his interviews with you --

12        A     Yes, sir.

13        Q     -- didn't he tell that you and her were the last

14   persons to leave the store?

15        A     With the -- that's two other teacher.  Four of us.

16        Q     Okay.

17        A     No.  Four of us -- three of us -- four of us was

18   the last people in the store.

19        Q     And did you handle the money in the store?

20        A     I don't handle the money.

21        Q     You're a bookkeeper, aren't you?

22        A     I help her with other work.  Yes, sir, I'm the

23   bookkeeper, but I don't handle that transaction that night.

24        Q     Okay.

25        A     My wife counts the money --
```

1          MR. NGUYEN:  Objection.  Nonresponsive.

2     Q     (By Mr. Nguyen) Were you two driving two

3  separate vehicles --

4     A     Yes, sir.

5     Q     -- that day?

6     A     We have two cars.

7     Q     Okay.  So you never checked up on your wife for

8  the rest of -- I mean you tried to, you allege you did?

9          MR. PHAN:  Objection.  Argumentative.  Are

10  you asking --

11          THE COURT:  Your objection's overruled.

12     Q     (By Mr. Nguyen) Okay.  So what do you

13  think happened to your wife?  Who do you think is

14  responsible?

15     A     At 11:00 o'clock, she went because a friend call

16  so she went back to store.

17          MR. NGUYEN:  Objection.  Nonresponsive.

18     Q     (By Mr. Nguyen) Who do you think is

19  responsible for killing your wife?

20     A     The African American guy and his friends.

21     Q     What African American guys?

22     A     The guy that came inside the store that day and

23  check out us inside the store.

24     Q     How do you know that was him?

25     A     I saw him.

| | | |
|---|---|---|
| 1 | Q | You saw him do it? |
| 2 | A | No, no.  I saw him came in. |
| 3 | Q | Oh. |
| 4 | A | But I didn't saw him kill my wife. |
| 5 | Q | Okay.  So you're just speculating to the fact that |

just because he poked his head in the door that he must have
killed your wife?

| | | |
|---|---|---|
| 8 | A | Several times. |
| 9 | Q | Several times? |
| 10 | A | Yes, sir. |
| 11 | Q | Okay.  Wasn't he eating next door at Hank's |

Crawfish for a while?

| | | |
|---|---|---|
| 13 | A | Yes.  Until he went back outside, he talk with his |

friends inside that car.  That's all I know.

| | | |
|---|---|---|
| 15 | Q | Okay.  So you were scared of these African |

American individuals, correct?

| | | |
|---|---|---|
| 17 | A | Well at first I thought he's -- it's weird. |
| 18 | Q | Okay. |
| 19 | A | They didn't think right. |
| 20 | Q | Did you go inside your car to go get your gun? |
| 21 | A | Yes, I did.  I went back -- |
| 22 | Q | Okay. |
| 23 | A | -- inside my car to get the gun.  Yes, I did. |
| 24 | Q | Okay.  You went in your car, you went to get your |

gun.  Did you go back out?

```
 1        A     Go back out, yes, I did.

 2        Q     You did?  You went back inside the store?

 3        A     Yes, I did.

 4        Q     Okay.  So when you went back inside the -- when

 5   you went to go home, you went back in your car, yes?

 6        A     Yes, sir.

 7        Q     You saw your wife lock up?

 8        A     I didn't see my wife lock up.

 9        Q     You did not see?

10        A     No, I did not see her lock into the store.

11        Q     Okay.  And so who did lock up the store?

12        A     My wife locked the store every day by herself.

13        Q     Okay.  So you knew she was gonna be the last one

14   out?

15        A     Yes.  She gonna lock the door.

16        Q     Okay.  Then you were scared of these African

17   Americans in a parking lot to go get your gun but you

18   didn't -- you weren't scared enough to stay back and make

19   sure that your wife was safe.  Yes?  Yes or no?

20        A     I made that --

21        Q     Yes or no?

22        A     Yes, sir.

23        Q     You were not scared enough to stay behind to make

24   sure that your wife was safe?

25        A     I made that mistake.
```

```
 1        Q    Okay.  So your theory is, what happened at the --

 2   at the salon was a robbery.  Is that what your assumption

 3   is?

 4        A    Yes.  Yes, sir.

 5        Q    Okay.

 6             MR. NGUYEN:  Judge, I'm gonna offer P14 --

 7   and these are some photographs.  P14, P15, P16.

 8        Q    (By Mr. Nguyen) Sir, this is the shopping

 9   center which the salon was located, correct?

10        A    Right.

11        Q    Right here?

12        A    Yes, sir.

13        Q    Salon, Hanks Crawfish?

14        A    Yes, sir.

15        Q    Okay.  Your salon was located right here?

16        A    Yes, sir.

17        Q    Okay.

18             MR. NGUYEN:  P14.

19        Q    (By Mr. Nguyen) That fairly and accurately

20   depicts the shopping --

21        A    Yes.  The picture.

22        Q    Okay.  P15 and P16 are the Google maps I have of

23   the location of the shopping center as well as the location

24   of your house?

25        A    Yes, sir.
```

```
 1        Q     P15, P16, fair and accurate depiction of the
 2  location?
 3        A     Right.
 4        Q     Of your house and business?
 5        A     Right.
 6              MR. NGUYEN:  P15, P16.
 7              MR. CRAIG:  No objection.
 8        Q     (By Mr. Nguyen) Okay.  So did you retrieve
 9  the car, your wife's car?
10        A     Mr. Gilbert give back the car.  Give me the car
11  back.
12        Q     Okay.  And it was a RAV 4, right?
13        A     Right.
14        Q     The keys were still in the ignition?
15        A     When I pick up the car at the garage, the tow
16  garage, yes.  They left the keys so I can pick up the car.
17        Q     Okay.
18              MR. NGUYEN:  Pass the witness, Judge.
19              C R O S S   E X A M I N A T I O N
20  BY MR. PHAN:
21        Q     Mr. Nguyen (sic), what was the reason why you
22  leave, you decide to leave the business before your wife
23  leave?  Is that normal in the course of your business
24  operation?
25              MR. NGUYEN:  Objection.  Relevance.
```

```
 1              THE COURT:  That's sustained.
 2        Q    (By Mr. Phan) There was a divorce on
 3   record and you testified earlier that you -- that
 4   your wife agree to file for divorce as a fact
 5   against CPS?
 6        A    Yes, sir.
 7        Q    Did you discuss this plan with anyone else?
 8        A    Yes.  We talk with another attorney.
 9        Q    What's the name of that attorney?
10        A    Tao Tran.
11        Q    Okay.  What did you discuss with her?
12              MR. NGUYEN:  Objection.  Relevance.
13              THE COURT:  That's sustained.
14        Q    (By Mr. Phan) Okay.  Anyone else that you
15   discussed with?
16        A    Cindy.
17              MR. NGUYEN:  Objection.  Relevance.
18              THE COURT:  That's sustained.
19              MR. PHAN:  No further questions, Your Honor.
20   Pass the witness.
21              C R O S S  E X A M I N A T I O N
22   BY MR. CRAIG:
23        Q    Mr. Vu?
24        A    Yes, sir.
25        Q    Today you testified that you hit your wife with a
```

```
 1   broken chair.

 2        A    Yes, sir.

 3        Q    You beat your wife in the parking lot?

 4        A    Yes, sir.

 5        Q    And you remember testifying on July 7th of last

 6   year in this court on record where you said, and I quote,

 7   when I asked you if you've ever choked your wife in front of

 8   the kids, you said, yes, I did.  I. tried to choke her but I

 9   didn't mean it because I was mad?

10        A    Yes, sir.

11        Q    So there's been a lot of instances of domestic

12   violence between you and your wife?

13                  MR. PHAN:  Objection.

14        A    That was one time ten years ago, sir.

15        Q    (By Mr. Craig) Okay.  Now in regards to

16   this African American gentleman you were talking

17   about is a suspect in your mind, correct?

18        A    Yes, sir.

19        Q    Was there an altercation between that person and

20   your wife?

21        A    I don't think so.

22        Q    No prior history?

23        A    With the African American guys --

24        Q    Right.

25        A    -- and my wife?
```

```
 1        Q    Right.   Any problems before that?

 2        A    Yes.

 3        Q    Oh really, what was that?

 4        A    Yes, sir.  But I don't know if it's him or

 5   somebody else.

 6        Q    Do you know if there was a prior incident between

 7   this person you're talking about and your wife?  Yes or no?

 8        A    No.

 9        Q    Does your wife have a restraining -- try to get a

10   restraining order against him?

11        A    I don't know.

12        Q    But she got one against you, didn't she?  She

13   tried to get one against you?

14        A    I don't know.

15        Q    You don't remember that?

16        A    He told me that.  I don't know.

17        Q    Okay.  How do you explain, H.P.D. during the

18   investigation and their position is that you have been

19   untruthful and you failed a polygraph.

20        A    Yes, he told me that.

21        Q    You find that odd?

22        A    Yes, sir, I find that odd.  Can I explain?

23        Q    No.

24                  MR. NGUYEN:  No.

25        Q    (By Mr. Craig) Now in regards to your
```

```
1   children.  You find it strange that both your

2   children do not want to be reunified with you?

3        A    I don't know that.

4             MR. PHAN:  Objection.  Assume facts not in

5   evidence.

6             THE COURT:  Objection's overruled.

7        Q    (By Mr. Craig) You are aware that your

8   children are very afraid of you?

9        A    No, sir.

10       Q    No.  You are aware that your children have

11  reported numerous incidents of domestic violence where you

12  consistently beat your wife and terrorize the children?

13       A    No, sir.

14       Q    Are your children lying if they say that?

15       A    Yes, sir.

16       Q    Why would they lie?

17       A    Because they think it's terrorizing the family but

18  I did not, sir.

19             MR. CRAIG:  I pass the witness.

20             THE COURT:  Anything else?

21             MR. NGUYEN:  One more follow up.

22        R E D I R E C T   E X A M I N A T I O N

23  BY MR. NGUYEN:

24       Q    Sir, a year prior to the death of your wife, you

25  and your wife went to go apply for a life insurance policy,
```

```
 1   correct?

 2        A    No, sir.

 3        Q    Never?

 4        A    No.  Never.

 5        Q    You never took out a $275,000 insurance policy on

 6   your wife's life?

 7        A    Yes.

 8        Q    You did?

 9        A    Yes, sir.

10        Q    Okay.  So now you did?

11        A    Yes.

12        Q    But not on you?  Yes?

13        A    No.  We had two policy.  That was ten years ago.

14        Q    You didn't apply for one in 2014?

15        A    No, sir.

16             MR. NGUYEN:  Pass the witness, Judge.

17             THE COURT:  Next witness.

18             MR. NGUYEN:  This detective.

19                  WENDELL GILBERT

20        Having first been duly sworn, testified as

21   follows:

22             D I R E C T   E X A M I N A T I O N

23   BY MR. NGUYEN:

24        Q    Sir, please state your name.

25        A    Wendell Gilbert.
```

1        Q     And you are employed where?

2        A     I work at the Houston Police Department, homicide

3   division.

4        Q     All right.  And you are the prime investigator in

5   the murder of Ms. Tuyet Tran, correct?

6        A     I am.

7        Q     And you believe Mr. Trang Vu is the person of

8   interest or is he a primary suspect?

9        A     He's the primary suspect right now.

10       Q     Okay.  And you've had how many interviews with

11  Mr. Vu?

12       A     I had a couple at the scene.  And then from the

13  same day we brought -- went back down to Travis and

14  interviewed him again.  I believe the following day after

15  that, we had -- he came in for the polygraph.  And then he

16  was interviewed that day as well.

17       Q     Okay.  And now you heard the testimony of the

18  father stating that he believes it was some African American

19  gentleman who killed his wife because he just went inside

20  the store.

21       A     I did.

22       Q     You heard that, correct?  And he tried to make it

23  seem like this was, in fact, a robbery, correct?

24       A     Yes.

25       Q     Based on the evidence that you have reviewed and

1    discovered in all the photographs and such, in your mind, do

2    you feel that this was, in fact, a robbery?

3        A    No, I do not.

4        Q    Okay.

5                MR. NGUYEN:   Judge, I'm also gonna offer P17,

6    P18, P19, P20, P21, P22, P23, P24, P25, P26, P27, P28, P29,

7    P30, P31, P32, P33, P34, P35, P36, P37, P38, P39, P40.

8        Q    (By Mr. Nguyen) These are photographs that

9    you provided for me?

10       A    Yes.

11       Q    And these are all taken as a part -- during the

12   course of your investigation.

13       A    Yes.

14       Q    And they fairly and accurately depict the

15   conditions that were proposed today?

16       A    Yes, sir.

17               MR. NGUYEN:   I'm offering what's marked as

18   P17 through P40, Your Honor.

19               MR. CRAIG:   No objection.

20               THE COURT:   They're admitted.

21               MR. PHAN:   Let me see.

22       Q    (By Mr. Nguyen) And so when you --

23               MR. PHAN:   No objection.

24       Q    (By Mr. Nguyen) I'm sorry.  When you

25   arrived at the scene, what in there made you believe

```
 1    this was not, in fact, a robbery?

 2         A    At the scene, I didn't think it was a robbery just

 3    all the items that were scattered around.  It seemed pretty

 4    clean for, you know, for somebody that -- when I was on

 5    patrol and made several robberies, you know, they typically

 6    make a good size mess and there was no forced entry.

 7         Q    Okay.  There's no forced entry?

 8         A    Right.

 9         Q    There's no forced entry into the cash register,

10    correct?

11         A    Correct.

12         Q    This was a pretty violent homicide.

13         A    Yes.

14         Q    But everything else still seemed to be pretty in

15    place?

16         A    Yes.

17         Q    And there was the mother's credit cards?

18         A    Yes, they were all there.

19         Q    What were -- that are in -- displayed in P22,

20    correct?  And when you or anyone were to arrive at the

21    scene, all of this was in plain view, correct?

22         A    Yes, sir.

23         Q    And if anyone was to rob the place, most likely

24    they would have taken that?

25         A    Yes.
```

```
 1        Q    Was there any cash laying around?

 2        A    There was some change on the floor and cash in her

 3   pockets sticking out.

 4        Q    Cash in her pockets sticking out.  So if a person

 5   was actually to rob the place, they would have taken that

 6   cash too, correct?

 7        A    Yes, sir.

 8        Q    There was also some phones found in the back

 9   office, correct?

10        A    Yes.

11        Q    Specifically, where were those phones found?

12        A    They were actually -- she was in the back room

13   where she was killed but the bathroom was right by it.

14        Q    Okay.

15        A    And they were found in the bottom of the trash can

16   underneath a bunch of other trash.

17        Q    Okay.  And so those phones, what condition were

18   they?

19        A    They were smashed.

20        Q    They were smashed, right?  So if a robber were to

21   come into the store and actually rob the place, don't you

22   think that would be a valuable item a robber would take with

23   them?

24        A    Yes.

25        Q    But in fact you found it in a trash can?
```

```
 1        A     Yes.

 2        Q     Conveniently in the woman's restroom?

 3        A     Yes.

 4        Q     And the father owns a firearm, correct?

 5        A     Yes, sir.

 6        Q     What kind?

 7        A     It's a revolver.

 8        Q     A revolver.

 9        A     Yes.

10        Q     I believe it's a .38?

11        A     I believe so but I'd have to look to confirm it.

12        Q     And you saw the -- there's an indention on the

13   phone --

14        A     Yes, sir.

15        Q     -- correct?  That was on a Samsung?

16        A     Yes.

17        Q     Were you able to match the butt of that gun with

18   the indention on the phone?

19        A     Yes.  I physically had the butt of the gun and I

20   set it into the indention and it fit perfectly.

21        Q     Okay.  So you believe it was the father's gun who

22   caused the damager on that phone?

23        A     I do.

24        Q     And it was thrown in the trash can.  Okay.  And

25   then you found the car?
```

```
 1        A    Yes, we did.

 2        Q    Now when you arrived at the scene around the

 3   parking lot, you see what's marked as P17, P18, P19, P20.

 4   This is a RAV 4?

 5        A    Yes, sir.

 6        Q    Mother's car.  At that part, in that general area,

 7   did you see any broken glass?

 8        A    No.

 9        Q    No broken glass.  So at the location where you did

10   find the car, did you find any broken glass?

11        A    It was busted inside the car, yes.

12        Q    What about outside?

13        A    I can't speak to that.  My partner made that scene

14   there.

15        Q    Okay.  So were the keys still in the ignition?

16        A    They were.

17        Q    They were still in the ignition at an abandoned

18   location.  Any person who would have wanted to hijack the

19   car, steal the car, they would have, correct?

20        A    Yes.

21        Q    If that, in fact, was stealing the car from that

22   parking lot.

23        A    Yes.

24        Q    No robber would just take the car and leave the

25   keys --
```

```
 1              MR. PHAN:  Objection.  Argumentative,
 2   speculative.
 3              THE COURT:  Objection overruled.
 4        A    Correct.
 5        Q    (By Mr. Nguyen) That's very highly
 6   unlikely, based on your experience and training in
 7   law enforcement and such, you don't believe a
 8   reasonable -- a robber would do that.
 9        A    No, I don't.
10        Q    So that would rule out the father's theory that
11   this was a robbery?
12        A    Yes, sir.
13        Q    You believe this was a violent and personal
14   murder, don't you?
15        A    I do.
16        Q    Okay.  And you're saying this as the detective and
17   based on your training and experience, you believe the
18   father is responsible for his wife's death?
19        A    I do.
20        Q    And you had -- you had a opportunity to review
21   over the mother's medical -- the medical examiner's report.
22   And the autopsy report that you provided -- autopsy photos
23   that you provided for me, they fairly and accurately reflect
24   the information as stated in that report?
25        A    Yes.
```

```
 1        Q     The skull on Ms. Tran's head shows six points of
 2   impact?
 3        A     Yes.
 4        Q     Do you have any idea what the instrument that was
 5   used to cause the death of this victim?
 6        A     We're thinking it's a hammer at this point right
 7   now.
 8        Q     Okay.
 9              MR. NGUYEN:  Pass the witness.
10                 C R O S S   E X A M I N A T I O N
11   BY MR. PHAN:
12        Q     Thank you for testifying today, Detective.
13              During your investigation, who did you
14   interview first regarding who found the victim that morning?
15        A     I can't tell you the order right now but I know
16   that I interviewed the students there and also the -- Anna,
17   I think it was Anna there.
18        Q     Uh-huh.
19        A     There at the scene.  Because they showed up the
20   next morning to teach and take the class and also Hai Pham.
21        Q     And why was it on your report, investigation
22   report, that you listed Mr. Vu as the one who found the
23   victim?
24        A     I don't believe I did.  Cause he was never allowed
25   into the business there.  He showed up but officers were
```

1    already there.  He wasn't allowed in at any point that day.

2         Q    Uh-huh.  So I'd like to divert your attention to

3    the Harris County investigative report.  It's listed the

4    decedent to be found at by spouse.  And the same fact is

5    being repeated throughout many documents provide by Harris

6    County H.P.D.  And it made its way into numerous CPS

7    investigation report.

8         A    That's not my document.

9         Q    Do you have any idea who --

10        A    Yeah.  Reportee, crime scene unit Bar.

11        Q    Uh-huh.  Okay.  Do you have any explanation why a

12   very simple fundamental fact, who found the victim was

13   incorrect?

14        A    I can't speak to that.  I didn't file that report.

15        Q    Are you the investigator in charge?

16        A    I am.

17        Q    So you did not make any effort to recognize or to

18   fix the circumstance?

19        A    To do what?

20        Q    To fix mistakes?

21        A    It's documented in my report who was there.

22        Q    Okay.  Did you interview Anna Tran and Hai Pham?

23        A    I enter -- yes, I did.  At the scene.

24        Q    Okay.  Are they the one who found the victim that

25   morning?

```
 1         A    Yes, they went in, yes.

 2         Q    Okay.  And what did they see to your knowledge of?

 3         A    I know Anna was there before Hai to teach the

 4    class.  She thought the business was locked cause all the

 5    lights were out.  So she called Mr. Trang and he said, well

 6    she should probably be on her way.  Hai Pham showed up,

 7    because they were supposed to have a meeting at 11:00 with

 8    Cindy and Melvin and he showed up.  And so evidently before

 9    that, Anna had called the police or they tried to call

10    police, she was evidently nervous.  So she had one of the

11    students call 911 thinking it was a burglary.

12              And so in the meantime, police go ahead and

13    arrived.  So when Hai showed up, he went in to look.  And

14    whenever he went in, he first saw a leg in the back room and

15    so he went out.

16         Q    Okay.

17         A    He called Mr. Trang.  And before he got there, he

18    called Mr. Trang saying, hey, you know, where's Anna.  And

19    he said, I don't know, she should be there.  I think is

20    what -- let me look.  I don't want to misspeak on this.

21    Hang on.

22              I know that Mr. Hai Pham had asked Trang to

23    send over Cindy's phone number so he can call her because he

24    had said that -- to do that.  Mr. Trang never did send the

25    number.  And so Mr. Trang or Hai Pham then called Trang back
```

```
1    and Trang said just call the police.  Hang on one second.

2         Q    Take your time.

3                   THE COURT:  All right.  We're gonna break for

4    lunch.  Be back about 1:15.  See you then.

5              (Lunch recess taken.  Off the record.)

6              (Open court.  All parties present.)

7                   MR. CRAIG:  Start with Mr. Phan and he's

8    gonna offer up the relinquishment on behalf of his client.

9                   THE COURT:  All right.  Very good.

10                  MR. NGUYEN:  Back on the record in the

11   interest of D         and P    T   .  Cause No. 2015-03795J

12   after the break.  I believe Mr. Phan has had discussions

13   with his client concerning a relinquishment.  Mr. Phan.

14                  MR. PHAN:  Thank you.

15                       TRANG VU

16        Having first been duly sworn, testified as

17   follows:

18              D I R E C T   E X A M I N A T I O N

19   BY MR. PHAN:

20        Q    Mr. Vu, will you please come up and state your

21   full name for the Court record.

22        A    Trang Vu.

23        Q    Okay.  Will you confirm that you're the father of

24   the two children D     T   and P     T   in this case?

25        A    Yes.
```

```
 1      Q     And you have been presented with a irrevocable

 2   affidavit of voluntary relinquishment of parental rights,

 3   and you were explained every part thereof and page of this

 4   document?

 5      A     Yes, I do.  Yes.

 6      Q     Okay.  And you were fully informed of your rights

 7   as a parent and that you voluntarily and knowingly agree to

 8   terminate -- termination of your right?

 9      A     Yes.

10      Q     By signing this agreement?

11      A     Yes.

12      Q     And barring up your rights, you agree to grant the

13   Department of Family and Protective Services all your

14   parental rights?

15      A     Yes.

16      Q     Or any adoptive parents?

17      A     Yes.

18      Q     And you agree that termination is done in the best

19   interest of the children -- your children?

20      A     Yes.

21      Q     Okay.

22            MR. PHAN:  No further questions.

23            MR. NGUYEN:  Offer it.

24            MR. PHAN:  And I would like to offer to the

25   Court Exhibit F1 for the record.
```

```
 1                    THE COURT:  All right.  It's admitted and

 2     accepted by the Court.  His rights are terminated under

 3     161.001.1 (K).  Anything else?

 4                    MR. CRAIG:  No, sir.

 5                    MR. NGUYEN:  And also under the

 6     circumstances, I ask the Court to declare Ms. Tran as

 7     deceased in this case.

 8                    THE COURT:  Yes.

 9                    MR. NGUYEN:  And we'll set it for entry on

10     July 7th.

11                    THE COURT:  Okay.

12                    MR. CRAIG:  Thank you, Judge.

13                    MR. PHAN:  Thank you, Judge.

14                    THE COURT:  You're excused.

15

16

17

18

19

20

21

22

23

24

25
```

```
1   THE STATE OF TEXAS )

2   COUNTY OF HARRIS   )

3            I, Julia M. Rangel, Official Court Reporter in and

4   for the 314th District Court of Harris County, State of

5   Texas, do hereby certify that the foregoing contains a true

6   and correct transcription of all portions of evidence and

7   other proceedings requested in writing by counsel for the

8   parties to be included in this volume of the Reporter's

9   Record, in the above-styled and numbered cause, all of which

10  occurred in open court or in chambers and were reported by

11  me.

12           I further certify that this Reporter's Record of

13  the proceedings truly and correctly reflects the exhibits,

14  if any, admitted, tendered in an offer of proof or offered

15  into evidence.

16           WITNESS MY OFFICIAL HAND this the 11th day of

17  July, 2016.

18                          /s/ Julia M. Rangel
                            JULIA M. RANGEL, Texas CSR 6412
19                          Expiration Date: 12/31/16
                            314th Official Court Reporter
20                          Harris County, Texas
                            1200 Congress, 5th Floor
21                          Houston, Texas 77002
                            713-222-4910

22

23

24

25
```