# EXHIBIT Y

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RELIASTAR LIFE INSURANCE     §
COMPANY,     §
    §
    Plaintiff,     §
    §
v.     §     Case No. 17-cv-2818
    §
TRANG VU,     §
P.T., a minor, and D.T., a minor,     §
    §
    Defendants.     §

## EXPERT WITNESS REPORT OF JAMES BINFORD

### I.  QUALIFICATIONS

My name is James Binford.  I am a resident of Harris County, Texas.  I am a retired Homicide Detective who served the Houston Police Department for 40 years (1970 – 2010), with 33 of those years assigned to the Homicide Division[1].  During those 33 years, I personally worked and investigated all, or part of, approximately 3,500 major crime cases.  Throughout that time, I became the division's senior detective / sergeant serving the longest of anyone in that role and capacity, and oftentimes referred to as *Mr. Homicide*.[2]  Most of the 3500 cases involved Murder, but also encompassed Assault to Murder, Major Assaults, Rape Murder and other crimes of violence, with dozens of murders involving abusive partners.

I have testified, under oath, in countless local, state, and federal trials.  I have testified before state and federal grand juries, and in many other legal hearings.  It is an estimate that I have testified under oath at least 1000 times over the course of my

---

[1] James Binford's professional resume is attached to this report.

[2] Houston Chronicle, Copyright 2007, Published Saturday, April 21, 2007, *Legendary "Mr. Homicide" retires from HPD* by Lindsay Wise (attached herein).



life time. The bulk of my testimony has been in Texas state district courts as a fact witness on investigations I conducted, but oftentimes, testimony was offered by the prosecutor, and sometimes the defense attorney, as an expert witness in the field of criminal investigations, specifically homicide investigations. In all of those cases, notice was filed with the Harris County District Clerk's office pursuant to Article 39.14(b) [1999] of the Texas Code of Criminal Procedures.

After honorably retiring from the Houston Police Department, I served for approximately 3 years as the lead investigator with a Special *Pro Tem* Prosecution effort in Harris County, Texas. The Pro Tem Attorneys and I were appointed by the Administrative Judge over District Courts to investigate and prosecute an extremely complicated embezzlement, theft, and public corruption matter involving investigators with the Harris County District Attorney's Office. I testified as an expert witness in that state grand jury investigation, which led to the felony indictment of Dustin Deutsch. Ultimately, that investigation resulted in successful federal prosecution of D.A. Investigator Lonnie Blevins, (*USA v. Blevins; Cause No. 3:13-cr-0003*) and state court trial conviction of D. A. Investigator Dustin Deutsch, (*State of Texas v. Dustin Deutsch, 183rd District Court, Cause No's 1449535 & 1449536*).

I currently hold numerous State of Texas Private Security licenses as a Private Investigator, Commissioned Security Officer, and Personal Protection Officer (Registration# 11333601 & 11333602). I am in good standing with the Texas Department of Public Safety, Regulatory Services Division, that monitor and control these licenses.

During the past five years, I have consulted as an expert witness in numerous matters, including providing expert witness testimony *In the Estate of Patrick Wayne Wright, Presumed Deceased,* in the Probate Court No. 1, Harris County Texas (Cause #430719 – Missing Person Presumed Deceased); the *State of Texas v.*

2

*Ryan Abner Burgs,* in the 232nd District Court, Harris County, Texas (Cause #1412867 - Murder), and before the grand jury in *State of Texas v. Ana Gonzalez-Angulo, in the 248th Judicial District Court, Harris County, Texas (Cause No. 1389543 – Aggravated Assault with a Deadly Weapon).* I am currently being compensated as a consulting expert in other death cases in Texas that are expected to go to trial.

## II. ASSIGNMENT

During the fall of 2018, I was contacted by Attorney John W. "Billy" Belk. Mr. Belk and I previously served as homicide detectives together between 1983 through 2007. Mr. Belk informed me that he and Attorney Megan Moore, of Rusty Hardin & Associates LLP, were appointed by Federal Judge Melinda Harmon as ad litem attorneys to represent the minor children of Tuyet Tran,                                in this matter pending in federal court. The minor children were currently in the care and supervision of the Texas Department of Family and Protective Services (State of Texas - CPS). I learned that the minor children's mother was murdered shortly after the children were removed from their home. The murder investigation is still open and active, and no one has been criminally charged.

I have been engaged by the law firm of Rusty Hardin & Associates, LLP, to review the circumstances surrounding the death of Tuyet Tran and provide my expert opinion concerning my review of the homicide investigation, child custody litigation, filed divorce, and other related matters and materials.

## III. INFORMATION AND DOCUMENTS RELIED UPON

In conducting the analysis to formulate my expert opinions, I have reviewed and considered the following documents:

1. Confidentiality & Protective Order
2. Milleni's Answers to 1st Set of Rogs and RFPs
3. 4Cs Family Evaluation (TRAN 430-442)

3

4. Texas SOS Filings for Signature Beauty Show/SBS Beauty LLC

5. Affidavit of Shayolonda Herron (TRAN 1187-1193)

6. Two (2) Affidavits of Tuyet Tran (TRAN 6-7 & 1369-1375)

7. Transcript of 7/07/15 Show Cause Hearing

8. Houston Police Dept. Investigation Report (TRAN 1438-1463)

9. Milleni's "Parent Petition" dated 7/03/15

10. Milleni's letter to "Boy & ▮▮▮ dated 7/06/15

11. Milleni's sketch of murder scene

12. Final Decree for Termination [of Parental Rights]

13. Reliastar application documents on Tuyet Tran's life insurance policy

14. Reliastar Transfer of Ownership

15. Reliastar approval of reinstatement

16. Pages from TDFPS file (TRAN 150-151)

17. Page from TDFPS file (TRAN 219)

18. Pages from TDFPS file (TRAN 251-252)

19. Page from TDFPS file (TRAN 167)

20. Page from TDFPS file (TRAN 184)

21. Email from Gilbert to DanPhi re email from Armstrong (TRAN 1368)

22. Page from TDFPS file (TRAN 245)

23. Emails between Mangram at TDFPS & Trang Vu (TRAN 474)

24. Cypress Psychological Center Evaluation of Trang Vu (TRAN 423-429)

25. Pages from TDFPS file – Intake Narrative (TRAN 137-153)

26. Page from TDFPS file (TRAN 166)

27. Page from TDFPS file (TRAN 214)

28. Pages from TDFPS file (TRAN 227-228)

29. Milleni's Petition to Change Name & Final Order

30. Photos produced by Milleni of family & salon

31. HPD Polygraph Report of Milleni (TRAN 1464-1467)

32. Minor Defendants' Answer & Cross Claim

33. Minor Defendants' Responses to Milleni's Interrogatories

4

34. Crime Scene photos

35. Transcript of 6/23/16 Hearing

36. HCIFS Autopsy Report ML15-2613

37. ML15-2613 Autopsy Photos

## IV. PURPOSE AND SUMMARY

During my initial review of the aforementioned materials, I learned that the Texas Department of Family and Protective Service, in Harris County, Texas had become involved in an investigation where ████████ (10 years of age) had fought and then choked another student in his school classroom. That encounter caused injury to the other child and school officials initiated an investigation. During the investigation by local school officials of that separate event they had reason to believe that ████ had learned to choke his adversary by watching his father choke and beat his mother during fights and even minor arguments at their home. There was also an obligation by school officials to report the incident to authorities.

As is standard protocol, the Texas Department of Family and Protective Services initiated an inquiry. I learned that during the inquiry, the matter was escalated into an official investigation of alleged domestic abuse at the hands of Trang Vu. As a result of the CPS investigation, ████████ were removed from their home and placed into state custody. A short time after the state removal of the children, and during the second phase of CPS involvement the children's mother, Tuyet Tran, was found beaten to death at her place of business. During the course of the Homicide investigations, the children's father, Trang Vu became "a person of interest" and ultimately a suspect in the murder because of the admitted domestic abuse prior to the murder, and other circumstances including motive, opportunity, deception, and inconsistencies in his prior and subsequent statements made related to the abuse. I learned, that as the investigation continued, a large life insurance policy, ($275,000) on the life of Tuyet Tran, through Reliastar

5

APPENDIX 0415

Life Insurance Company, had been discovered and that the suspect, Trang Vu, is the sole beneficiary.

The murder investigation of Tuyet Tran is currently being handled by the Houston Police Department. Detective Wendell Gilbert is the lead investigator. A year later Mr. Vu relinquished parental rights of the protected children,

Custodial and relocation issues are being handled by The Texas Department of Family and Protective Services (CPS).

Attorneys Moore and Belk have been assigned by the Court, as ad litem protectors, to represent the minor children,                          , concerning the beneficiary rights of the life insurance policy benefits. Mr. Vu is contesting the litigation and is asserting primary beneficiary rights to the insurance proceeds.

I have been retained to review the known facts of the life and death of Tuyet Tran, as discerned from the documents provided, and to attempt to develop a suspect, motive, and reason for her death. I have also agreed to offer expert witness testimony concerning my opinions related to this review.

I was asked, and directed by Attorney Belk, to go into the investigation with an open mind, looking for other plausible, possible, and/or probable suspects and to bring Tuyet's death into finer focus. I was asked to develop and give an independent opinion of my findings. I agreed to enter the matter with an open and objective mindset. Concerning compensation for my efforts, I will also receive a flat fee of $5,000.00 for my work on this matter. My testimony is based on my expertise as a homicide investigator; my general knowledge of domestic violence; my experience as a crime scene investigator; my review of the materials provided; and my attendance and observations during the deposition of Trang Vu (aka: Itani LosAngel Milleni). I have also reviewed documents of statements made by Mr. Vu which included prior inconsistent statements.

6

## V. CRITICAL REVIEW

### 1. Trang Vu and Tuyet Tran's marriage likely began as a sham.

████████████████ are the children of Trang Vu (male 45 years of age) and Tuyet Tran (female 48 years of age). Both Trang Vu and Tuyet Tran were born in Vietnam. Trang Vu immigrated to the United States during the 1980's and settled in Orlando, Florida, with his extended family. At some point he returned to Vietnam to meet Tuyet Tran, whom he married within a few days, and they returned to the United States. Trang Vu had been told, via a telephone conversation, with his sister who was still in Vietnam, that a woman whom he had not previously met, Tuyet Tran, wanted to get married. Trang Vu flew to Vietnam and met Tuyet Tran. He testified that he met and first spoke to Tuyet when he arrived at the airport in Vietnam. Several days later they were married, and Vu brought Tuyet with him to the United States.

I have learned, and noted many times, during my years of investigating violent crimes in the Vietnamese community that the practice of chain migration, also known as family reunification under federal law, is the process by which green card holders or legal U.S. residents may sponsor a family member for immigration to the United States.[3] It is common for some Vietnamese immigrants, after they have achieved America citizenship, to return to Vietnam and accept money to marry a person and then return with their new spouse to gain United States citizenship for them. These sham marriages have always been hard for authorities to detect and prove. In my opinion, Trang Vu and Tuyet Tran entered into a loveless, sham marriage to make Tuyet a citizen. This behavior would show an earlier deceitful and criminal manner in Vu's thinking and mindset – the same that would entertain the idea of a cashing in on the life insurance proceeds from Tuyet Tran's death.

---

[3] What is 'chain migration'" CBS NEWS, January 29, 2018. See https://www.cbsnews.com/news/what-is-chain-migration-definition-visa-trump-administration-family-reunification/

APPENDIX 0417

In his deposition, Trang Vu also detailed how he and Tuyet Tran had spoken of, and tried to carry out, a subterfuge in which they get a divorce so that the CPS case would go away. He also detailed a conversation (in which he sought an attorney's advice) where he and Tuyet would get a divorce and go to Vietnam and accept $50,000 (each) to marry other partners, and then return them to the United States for citizenship in a sham marriage scheme. [4] These facts, if true, also suggest that Trang Vu and Tuyet Tran's marriage was not a love match.

Nor did Vu seem to particularly admire or respect his wife. After traveling in the United States, Trang Vu and Tuyet Tran settled in Houston, Texas. Trang Vu claims to have graduated from a college in Florida. Trang Vu later would report, and repeat in other reports, that Tuyet Tran operated poorly on her 5th grade level education. A review of records showed that Trang looked down on his lower-educated spouse. According to Vu, that lack of education was one of the reasons why his wife could not do a good job of raising their children,                          . Vu's criticism of his wife's intellect came before and after the tragedy of her death.

### 2. Vu's volatile nature on full display during CPS investigation.

After learning of the dangerous home environment                          were subjected to, school officials notified the Texas Department of Family and Protective Services. This is a common referral through Child Protective Services, but this matter was of a heightened concern because of the degree of violence that was claimed by                          and the acting out by          at school.

I learned that Ms. Shayolonda Herron, of Texas Department of Protective Services, was assigned to the case by that agency. During the scope of my review, I have examined her report and find it to be thorough, insightful, and well thought out. It appears to be a complete report. Based on my review, Ms. Herron's

---

[4] In fact, Vu later admitted during his deposition testimony that he very recently engaged in another short-term marriage with a similar scheme used to marry Tuyet Tran. However, the recent short-term marriage failed after just a few short weeks because of incompatibility, according to Vu's testimony.

8

APPENDIX 0418

investigation was impeded by what appeared to have been a purposeful noncompliance and resistance of the complete process by Trang Vu. Vu exhibited a volatile nature during the CPS inquiry.

During CPS's initial contact, the agency's goal was to determine the safety of the children. Trang Vu resisted CPS's investigation, including by keeping 
 away from Ms. Herron, keeping the children out of school, not answering or responding to mailed notices, and finally encouraging a friend and renter (Robbins Mitchell) in his home to try to intimidate and control Ms. Herron's official actions when she attempted to interview each child separately and apart from Mr. Vu.

On June 5, 2015, Ms. Herron went to the Vu/Tran home[5] and met with Mr. Vu. Vu attempted to dominate the interview and announced that he had video recordings going and that the CPS worker would not be allowed to speak with his children privately without Vu's presence. At some point during this meeting a friend (and renter) of Trang Vu, later identified as Robbins Mitchell, entered into the conversation and started yelling at Ms. Herron. Mitchell closed into Ms. Herron's personal space and started yelling into her ear that she," was nothing but a coward". Mitchell would refuse to back away and continued to yell at Ms. Herron. After seeing the situation was escalating and deteriorating, Ms. Herron wisely ended the attempted interview and walked away from the house. Robbins Mitchell continued to yell at her and call her a coward.

It should be noted that not only did                     , and Tuyet Tran have to deal with Trang Vu's anger and instability, but also with Vu's tenant, Robbins Mitchell.

---

[5] At the time, Trang Vu, his wife Tuyet Tran, and their two children lived at 9226 Sandstone Street, Houston, Texas, 77036.

9

APPENDIX 0419

Because of the volatile and uncooperative responses of Trang Vu (and his friend and renter Robbins Mitchell) and the reports of pervasive domestic abuse, CPS officials quickly moved to have███████████████ taken into protective custody.

On June 24, 2015, Harris County Constables and CPS officials coordinated to remove ███████████ from their home.   During the service of that Writ, officers were forced to arrest Robbins Mitchell for interfering with A Public Servant during the commission of their duties.  After the removal of ███████████ on June 24, 2015, the investigation by CPS continued.

### 3. Claims of domestic violence substantiated

While reviewing Ms. Herron's report, I noted that she made her initial attempts to learn of the safety of ███████████ after May 14, 2015.  Over the next two weeks, Ms. Herron made numerous attempts to speak with ███████████ parents, to no avail. During a June 3, 2015 telephone conversation with Ms. Herron, Tuyet Tran, mother of the children, spoke of her fear of her husband and that she was, "scared to speak with me".[6]  It is my opinion that Tuyet Tran was afraid to cooperate with the Department of Family and Protective Services in their CPS investigation concerning the safety of the children, because she feared the consequences and her husband's unpredictable response.

Ms. Herron had knowledge of the report Trang Vu had hit the mother (Tuyet Tran), including beating her with a chair.  According to Ms. Herron's report, "the mother is fearful of reaching out for help, as she does not want the father to retaliate against the children."

---

[6] According to the Office of Justice Programs, Bureau of Justice Statistics, United States Department of Justice, "Intimate partner violence against women declined from 1993 through 1998," however, "One-third of all murdered females were killed by partner."  Intimate Partner Violence, May 17, 2000 http://www.bjs.gov/index.cfm?ty=pbdetail&iid=608

10

At one point during May of 2015, I noted that Ms. Herron was able to make an appointment with Tuyet Tran to speak to her about the children's wellbeing, but that appointment was broken by Tuyet Tran. Tuyet Tran would later tell Ms. Herron repeatedly that she was afraid of her husband, Trang Vu.

On June 4, 2015, Ms. Herron, along with an interpreter, spoke with Tuyet at her workplace. Tuyet spoke of her fear of her husband and his abuse towards her.[7]

Trang Vu would later admit to CPS, Houston Police, and in various legal proceedings that he was violent to his wife and would strike, beat, and choke her.[8]

In a sworn statement, given on July 7, 2015, Tuyet Tran gave several examples and incidents where she was beaten, choked and threatened. She told of calling the police, but her husband was never arrested. She also stated among other things that her husband was "abusive and a control freak." She also said, "He has physically and verbally abused me for the last 8 years. He beats me, hits me,

---

[7] "…[G]ender affects the use of violence to control one's partner in heterosexual relationships simply because of average sex differences in size and strength. The use of violence as one tactic in an attempt to exercise general control over one's partner requires more than the willingness to do violence. It requires a credible threat of a damaging violent response to noncompliance. Such a threat is, of course, more credible coming from a man than a woman simply because of the size difference in most heterosexual couples." A Gender Theory of Domestic Violence (Intimate Terrorism). http://www.womenssupportproject.co.uk/userfiles/file/resources/nationalresources/Intimate%20Terrorism. %20Johnson.pdf

[8] "Strangulation, defined as cutting off air supply or blood circulation by applying pressure to the neck, can lead to neurological damage within seconds and death in under five minutes. It's one of the most lethal forms of domestic violence, and depressingly common: Studies suggest anywhere from 10 to 68 percent of abused women have been strangled. When men strangle, experts say, they're broadcasting their capacity to kill. Thanks to years of research, we now know that strangulation is one of the best predictors of a future homicide in domestic violence cases. A 2008 study found that 43 percent of women murdered in domestic homicides and 45 percent of attempted murder victims had been strangled in the past year by their abusive male partners. If a woman has been strangled, she is seven times more likely to become a homicide victim. "The minute you put pressure on someone's neck, you are really announcing that you are a killer," said Gael Strack, a former domestic violence prosecutor in California who is now one of the nation's leading strangulation experts." A Legal Loophole May Have Cost This Woman Her Life. By Melissa Jeltsen, Jan. 18, 2016 Huffington Post. https://www.huffingtonpost.com/entry/ohio-strangulation-felony_us_56153530e4b0fad1591a36bf

11

APPENDIX 0421

and destroys our personal property. In or about 2009, he threw a chair at my head because I was working and I could not go home early. When I got home, he choked me[9] and I called the police." During Vu's recent testimony under oath at his deposition, he acknowledged grabbing his wife around the neck out of frustration.

In an August 21, 2015 interview, Officer Gilbert learned from Trang Vu that uniformed police had been called at least five times because of accusations of domestic violence. However, Vu was never arrest for assaulting Tuyet. <u>It is my opinion that an accurate number of the beatings of Tuyet Tran by Trang Vu will never be known, even though Tuyet Tran documented a number of instances of abuse, and Trang Vu readily acknowledged beating his wife. Interestingly, Tuyet Tran's autopsy report notes many healing scabs on her back and abdomen, an indication of systematic victimization from domestic abuse.</u> "A victim who is repeatedly assaulted either by threats or direct physical attacks may be exposed to more severe intimate partner violence than someone who experiences a single victimization, all else being equal."[10]

No review of the final six weeks of Tuyet Tran's life would be complete, however, without noting her chilling statement to Ms. Herron during a June 4, 2015 interview when, among other statements of fear, she said "something is wrong with his mind". Tuyet Tran was speaking of her husband, Trang Vu. She continued in that interview by stating that she "always was telling her husband that he needs help".

---

[9] Strangulation is recognized by experts as a major red flag in domestic violence situations. A woman who has been strangled by an intimate partner is seven times more likely to become a homicide victim down the line. One study found that 43 percent of women killed in intimate partner homicides had been strangled in the past year by their abusive male partner. This is Not a Love Story: America's Deadly Domestic Violence Problem, by Melissa Jeltsen, The Huffington Post. https://testkitchen.huffingtonpost.com/this-is-not-a-love-story/#

[10] Intimate Partner Violence; Attributes of Victimization, 1993-2011, November 2013, U.S. Department of Justice, Office of Justice Programs, Bureau of Justices Statistics, Special Report. https://www.bjs.gov/content/pub/pdf/ipvav9311.pdf

12

Based on my experience in homicides involving domestic violence, it is my opinion that there were several factors affecting Tuyet Tran's ability to cope with or escape from the domestic violence. Those factors included, but are not limited to: 1) a marriage that likely started as a business relationship; 2) few, if any, monetary resources[11]; 3) a language barrier with her limited ability to speak English; 4) no family support network in the immediate area[12]; 5) no friends in area she could list as a reference; 6) a very controlling and dominating husband; 7) a violent husband who had beaten her often in the past; and, 8) lack of arrest and police action when called to their home over repeated beating issues.[13]

It is my opinion that because of the well-established pattern of domestic abuse, facts known and observed before Tuyet Tran's murder, her death was predictable and preventable had persons with knowledge of the abuse reported Vu's conduct to the appropriate authorities, who could have taken action to protect her. During the months leading up to Tuyet's death, Trang Vu's actions towards his wife and children can only be described as, among other things, controlling, bully-like, volatile and dangerous.[14]

When ⬛⬛⬛⬛⬛ were removed from Trang Vu's home, Tuyet Tran used that opportunity to move out and separate from her husband. She

---

[11] For example, the gender gap in wages can create an economic dependency that enhances men's control over women and contributes to women's entrapment in abusive relationships.

[12] According to CPS records, the closest blood relative lived in the state of Florida.

[13] "The criminal justice system, heavily dominated by men, and involving a culture of masculinity that has not always been responsive to the problems of women experiencing intimate terrorism, which was often treated as if it were situational couple violence." Buzawa, Eva Schlesinger. 2003 Domestic Violence: The Criminal Justice Response. Thousand Oaks, CA: Sage.
http://www.womenssupportproject.co.uk/userfiles/file/resources/nationalresources/Intimate%20Terrorism.%20Johnson.pdf

[14] "Experts consider intimate partner homicides among the most predictable and preventable of all murders because they tend to follow well-established patterns." "More women are killed by intimate partners in the United States than by any other group of people. It's not strangers, friends or acquaintances who pose the biggest threat to women's lives: It's the men they date and marry." This is Not a Love Story: America's Deadly Domestic Violence Problem, by Melissa Jeltsen, The Huffington Post. https://testkitchen.huffingtonpost.com/this-is-not-a-love-story/#

13

established temporary residence at a friend's home but failed to establish a safety plan.[15]

It is noteworthy that ████████ and Tuyet Tran expressed concerns and fear about Trang Vu's volatile behavior. According to a report released by the Centers for Disease Control and Prevention, "over half of the killings of American women are related to intimate partner violence, with the vast majority of the victims dying at the hands of a current or former romantic partner.[16]

In an effort to try and develop a suspect in Tuyet Tran's death her very words ring loudly when she stated," He has a gun, and I am afraid for my body and my children every time he has a hot temper that he might use it and shoot me." During my many years of police service, I saw many battered women who were afraid to file charges because they had no support system and wanted the police to make the batterer stop the beatings, without having to take official legal action. It is my opinion that Tuyet Tran was afraid to file domestic violence charges against Trang Vu because of the fear, and the probable reality, that she had no support system to protect her.

---

[15] "We tell women repeatedly to leave the abuser, leave the abuser, leave the abuser, but when she does she increases her risk of homicide," said Susan Sorenson, a professor of social policy at the University of Pennsylvania who researches violence prevention. Kim Gandy, president of the National Network to End Domestic Violence, said it's critical for women attempting to leave an abusive partner to make a safety plan. Victims should reach out to their local domestic violence coalition, she said, for assistance with planning and resources. "There are opportunities at many points along the line to evaluate risk factors and provide additional support and safety for the survivor, so that she doesn't become a homicide victim," she said. This is Not a Love Story: America's Deadly Domestic Violence Problem, by Melissa Jeltsen, The Huffington Post. https://testkitchen.huffingtonpost.com/this-is-not-a-love-story/#

[16] The CDC analyzed the murders of women in 18 states from 2003 to 2014, finding a total of 10,018 deaths. OF those, 55 percent were intimate partner violence-related, meaning they occurred at the hands of a former or current partner..." In 93 percent of those cases, the culprit was a current or former romantic partner. The report also bucks the strangers-in-alleys narrative common to televised crime dramas; Strangers perpetrated just 16 percent of all female homicides..." https://www.theatlantic.com/health/archive/2017/07/homicides-women/534306/

14

APPENDIX 0424

It is my opinion that another indicator pointing to the identity of the killer of Tuyet Tran, is taken from a June 24, 2015 interview of ten-year-old who gave a long and detailed account of his father's violent and angry history shared with CPS Officer Herron. reportedly stated that, "...his greatest fear is that his father is going to kill his mother." It is my opinion fears came to fruition in the death of his mother – accordingly, I believe that Trang Vu kill Tuyet Tran.

Domestic homicides have been called the most predictable and preventable of all homicides. According to experts, most of the domestic homicides have at least seven well known and common risk factors[17] that ended in death:

- the victim was separated from the person who killed her, or she was getting ready to separate from him
- the couple had a history of domestic violence
- the level of violence had been increasing
- the abuser had shown signs of obsessive behavior, including stalking the victim
- the person who killed their spouse was depressed
- in the past, the abuser had threatened to kill the victim

By his own admissions Trang Vu acknowledged many of these factors were present in his relationship with his wife, with the exception that he never admitted to threatening to kill Tuyet.

### 4. The murder of Tuyet Tran.

On July 21, 2015, at approximately 11:11 am, Tuyet Tran was found brutally beaten to death in her workplace, Signature Beauty, at 10800 Bellaire Blvd, Unit D.

---

[17] *Domestic Violence – Is There a Risk of Death*, Western Centre for Research & Education on Violence Against Women & Children (Reprinted from the Neighbours, Friends and Families Campaign): Common Risk Factors outlined by the Domestic Violence Death Review Committee (DVDRC). http://makeitourbusiness.ca/warning-signs/domestic-violence-is-there-a-risk-of-death

APPENDIX 0425

The business location is found in the "Lion Square Plaza". Ambulance crews responded to the site after Tuyet Tran had been found and the ambulance crew confirmed that she was dead.

The Houston Police Department responded, and a large and intense investigation was initiated. A review of the report, known in Houston Police records as # 941745-15, indicated that the initial response was by marked uniformed officers who contacted supervisors and then the specialized Homicide Division Investigators, and Crime Scene Technicians were directed to the scene. Patrol Officers became involved to look for the dead woman's car. Resources within the Auto Theft Division of the Houston Police Department were utilized to start an electronic search of a "Lo-Jack" system on the missing car of the murder victim. Crime scene units were directed to the scene to help identify and secure evidence noted at the scene.

HPD Homicide Investigators W.G. Gilbert and C. Liu were assigned the Homicide investigation, with numerous other officers having duties and assignments during the investigation. Another pair of Homicide Investigators, B. Tesfay and K. Ferguson, were notified and also came to the scene to help in the wide-ranging investigation. Investigator Liu would coordinate with the Harris County Medical Examiner's Office with that agency's involvement.

I noted, with interest, that the first words uttered by Trang Vu to Investigator Gilbert, when Gilbert introduced himself were, "They think I killed my wife, but I did not kill my wife sir". It was my observation over many crime scenes that most loved ones who have just learned of someone being mortally injured or hurt would want to know how they are and then, who did this. Trang Vu's immediate denial of complicity in the murder of Tuyet Tran was noted, and in my opinion indicative of guilt.

16

During the initial phases of the investigation it is noteworthy that the onsite supervisor, Officer W.G. Gilbert directed that Trang Vu be driven to the downtown HPD Headquarters to be interviewed as soon as possible. Not all of next of kin, who have just learned of the death of a loved one, are immediately interviewed. That painful process can come later in the investigation, but Officer Gilbert felt an immediate interview was warranted and called for because of the suspicious actions of the husband.

Officer Gilbert would note and document in his report, Trang said that he and his now dead wife were going through a divorce and that he, Trang, "had a hot temper." Details of Trang telling CPS how he hit his wife when he was mad at her were shared with the Homicide investigator at that time as well.

During the course of the law enforcement interview, and repeated in later interviews, Trang Vu told of his wife's business and an ongoing school and training session for paying students (apparently paid cash) that had taken place the day of the murder. Towards the end of the day Trang Vu would tell of a black male walking into the shop and looking around and then turning around and walking out without saying anything to anybody. At that time the shop was occupied by Lucy and Kelvin (a couple from California), Trang Vu and Tuyet Tran. According to Vu, at the urging of Kelvin, Vu was told to go to his car and get his gun because of the actions of this black man. It is not clear to me at this point why Kelvin, a visitor from California, would know Trang Vu carried a gun. However, following Kelvin's suggestion, Vu claimed to have walked outside to his car and removed a pistol. Vu would claim he carried the pistol because some cars in the area had been broken into. He claimed to return to the shop where the four persons continued to count, "a bunch of cash," with the pistol in his belt for protection.

According to the police report, another person, Ana Hoa Tran, also saw a black male go into the front door of the Tuyet Tran's shop, as Ana was leaving the

17

shop, around 7pm." It should be noted that restaurants are on each side of the nail shop of Tuyet Tran and customers come and go to these shops often.

Developing a timeline would suggest that this unknown black male, seen by Ms. Ana Hoa Tran, was the same black man that caused Trang Vu to go to his car and get his gun. The time would have been around 7pm. The California couple continued their business of counting and separating money and then loading their luggage. There is no other indication that the black male referenced in the police report, had a connection to the crime scene, or murder of Tuyet Tran.

Trang Vu claims that he helped Kelvin and Lucy load their luggage and he, Trang Vu, left the shop shortly afterwards and last saw Tuyet locking the door to the business. It is important to note that Tuyet Tran was found dead the next morning inside the unlocked store and that Trang Vu claimed that he did not leave shortly after 7 pm, but later.

Robbins Mitchell would later report he thought Trang Vu got home that night sometime around 9 pm, about the time he, Mitchell, went to bed. It is about two miles from the Bellaire business to the home of Trang Vu and Tuyet Tran. In an August 21, 2015 interview, Trang also estimated, "it was around 9:00 pm," when he got home. He claimed that he left, "around 8:00 pm." The timeframe between 8 pm and 9 pm is thought to be the timeframe that Tuyet Tran was beaten to death. It is my opinion that Trang Vu's whereabouts during this critical time is suspect, at best.

A witness was located that saw an Asian male leaving Tuyet's shop between 8:00 and 8:15 pm. A police photospread, which included the photo of Trang Vu, was shown this possible witness (Michael To, a Vietnamese male). Mr. To could not, and did not, pick Trang Vu as the person seen leaving the shop.

18

Another noteworthy witness is Hai Pham. Pham is an old family friend of Trang and knows of his long-standing temper. He had been called numerous times by Tuyet Tran to "calm down" Trang Vu. Pham was also aware of "financial issues." Pham recognized that Trang Vu would lower his voice when Pham was in the area. Pham appears to be an older, person of respect in the Vietnamese community.

Yet another noteworthy witness is Attorney at Law, Natalie Nguyen (Tammy Tran Law firm) who told of a July 20, 2015 telephone conversation (the day before Tuyet Tran's murder) from Tuyet Tran. During that telephone conversation Tuyet Tran asked attorney Nguyen if she could get a Protective Order for her from her husband Trang Vu, because of her physical fear of him. Tuyet Tran told Ms. Nguyen several times that she was very scared of her husband and wanted help.

Tuyet Tran would be brutally beaten to death the very next day, in a timeframe that Trang Vu cannot account for.

In one of the most striking facts of this entire matter, Investigator Gilbert would retrieve a video from Hank's Cajun Restaurant, an adjoining business to Tuyet Tran's shop. In the video (camera #7) Gilbert notes Tuyet Tran's vehicle to be driven from the parking lot at 10:31 pm.[18] More noteworthy is the audio portion of the video that Gilbert reports he heard Tuyet screaming at 8:17 pm and then, after a jump in the video, he could hear her scream again at 8:41 pm. Again, her death comes during the timeframe where Trang Vu is missing. The Vu home is only two (2) miles from the murder site.

During the course of the investigation, I noted that Officer Gilbert arranged, and Trang Vu agreed to take, a polygraph test. The test was administered on July 29, 2015 by Examiner R. Montoya.

---

[18] It is my understanding that the timestamp may be an hour off, so the actual time the car was moved may have been 9:30 pm.

19

The results of the test showed deception, including in at least three of the relevant questions asked:

R4) Did you plan with anyone to cause the death of your wife?
Examinee's answer: No

R5) Did you cause the death of your wife?
Examinee's answer: No

R7) Did you put any of your wife's cell phones in that trash can?
Examinee's answer: No

It was the opinion of Mr. Montoya that Trang Vu was not being truthful in these very important and meaningful questions. When confronted about his apparent lies, Trang Vu would claim that he was very tired and could not continue. He was allowed to leave.

In my 40 years of experience, 33 years of investigating murder cases, polygraph examinations are a valuable indicator of truth or deception. Trang Vu failed a very comprehensive polygraph regarding his personal involvement in the murder – the display of deception is noteworthy.

After a detailed and critical review of the Houston Police Murder Investigation, I found it to be complete and thorough. It appears to be methodical and follows the leads that are noted. The report indicated that many hours and many different persons and specialized groups were involved in this case. The case is still an active case according to the Houston Police Department, and it can only be hoped that Tuyet Tran will someday be afforded the justice she deserves.

20

APPENDIX 0430

It is my opinion that as the investigation progressed, Trang Vu passed from a person of interest to the sole suspect in the death of his wife, Tuyet Tran.

I have also noted that the suspect, Trang Vu, has changed his name to Itani LosAngel Milleni and has moved from the Houston area after relinquishing any parental rights. I have worked other criminal cases where suspects have changed or altered their names and moved from the area to avoid contact with the ongoing investigation.

Trang Vu's temper and possible mental disfunction have been known and chronicled for over a decade and seem to have become worse.

Trang Vu and Tuyet Tran had years of money problems and marital discord. Their union appears to have started in a loveless marriage that may have been a business agreement. Trang Vu's periodic unemployment and unfulfilled job status led him to use and abuse the credit cards of Tuyet Tran and created more money issues. The $275,000 life insurance policy that was taken on Tuyet Tran and an equal one, or even a lesser one, was never purchased for Trang Vu. The renewal, after the payments lapsed only dealt with a policy for Tuyet, and not her husband. Tuyet Tran's murder came within a one-year timeframe of the renewal of the lapsed life insurance policy. It is unknown, by this author, if the insurance policy has a time restraint associated with payment claims on this policy. It is my opinion that the insurance money was one of the motivating factors leading to Tuyet Tran's death.

I believe the legal issues with Child Protective Services and the removal of the children, during May, June, and July of 2015, may have spurned an opportunity for Tuyet Tran to finally leave the troubled marriage by separating from Trang Vu. The serious financial and marriage crisis potentially tipped into a volatile and deadly one, ending in a staged crime scene and murder. The thought of the $275,000 windfall was the tipping point.

21

APPENDIX 0431

—

Trang Vu was known to carry weapons capable of inflicting injury or death: he testified about owning a handgun (now in police custody) and also a hatchet that he kept within his reach under the driver's seat of his car. Interestingly, the hatchet Trang Vu testified that he kept in his car, was mysteriously missing from the vehicle when searched by Detective Gilbert soon after Tuyet Tran's body was discovered brutally beaten to death.

Based on the description of the fatal wounds during the autopsy, and observations of photographs of the deadly skull-fracturing wounds to Tuyet Tran's head, it is my opinion that the murder weapon was probably a hammer/hatchet type of object, similar to what has been described as in Vu's possession prior to the murder. During my forty years as a police officer I noted that persons who carry guns, hammer/ hatchets, knifes, etc. within arm's reach in their car do so with the idea of using them as a weapon, and not just a convenient storage site.

It is my opinion that the brutal beating type injuries sustained by Tuyet Tran are consistent with a crime of passion with anger at its base and cause. A strong-armed robber would overpower the victim, grab or strike once, and leave quickly, not staying to act out a crime fueled by such anger. A robber's goal would be getting the money and flee quickly.

It is my opinion that Tuyet Tran was killed in an apparent staged murder scene. The scene was designed to mislead the police into making them believe she had died at the hands of a botched robbery. The scene indicates that the killer broke her cell phones into pieces. Recovered broken pieces of the cell phone match the shape of the butt of the handgun carried and recovered from Trang Vu. Trang Vu had in depth computer and cell phone skills and would have known that the crushed and broken phones would have destroyed needed information. An attempt

22

APPENDIX 0432

to put the phones in the bottom of the garbage can in another area away from the body and then covering them is noteworthy and suspect.

It would be extremely rare for a strong-arm robber to bring a blunt object to use as a weapon in a business robbery. It would be unlikely that a strong-armed robber would take the time to purposefully break cell phones.

A total of $19.00 cash currency was left sticking from the rear jean pockets of the murder victim. The money stuck out several inches and would have been easily seen. A strong-armed robber would not have left that money, because that is the very reason of his actions, the money.

The victim's purse with credit cards, wallet and drivers license, and other identification was left in the open at the scene. A robber would have taken all of these items, along with the cell phones, which have intrinsic value with the data storage.

I noted Tuyet Tran's vehicle was taken from the murder site and dumped approximately 2 blocks away from her murder site. It is my opinion that a killer that needed transportation to flee his crime would not have stolen the vehicle of a woman he just murdered to drive only two blocks. Driving the car only two blocks would make it easier for Trang Vu to return to the scene and get his car to drive away. The broken window of the car may indicate some attempt to misguide the police with the idea that the break in was needed to get the car for an escape by a robber that had arrived without transportation. In this staged robbery, the killer had the keys and a broken window would not have been needed. Glass from the window was both inside and outside the vehicle, and occurred at the recover site, not the theft site. Experience shows a broken car window has the glass driven into the inside of the car. I believe the broken window was a misguided after thought in a staged event.

23

APPENDIX 0433

I reviewed the autopsy report of Tuyet Tran and noted at least 6 serious wounds to her head with resulting skull fractures. Each of these wounds may have been fatal by themselves. These wounds were directed to the front, side, and rear of the head and were from a source of deep anger and frenzy. The wounds of Tuyet Tran appear to come from an object like a hammer or a hatchet. A stranger, a strong-armed robber, would not have made these type injuries in a hurried botched robber. As a police officer for 40 years I never worked, caught, or knew of a robbery suspect who picked a hatchet or hammer as his weapon of choice.

In a final analysis of the known facts of the death of Tuyet Tran, it is my opinion that Trang Vu did in fact kill his wife Tuyet Tran. I have come to that opinion by following the known facts and incidents and combined those with Trang Vu having the motive, the opportunity, and the personal demeanor to commit such a brutal and heinous crime. I believe the crime was driven by hate, anger, and the desire to cash in on a large life insurance policy.

## VI. CONCLUSION AND SUMMARY OF OPINION

After a lengthy review and study of the known facts of Tuyet Tran's death, it is my opinion that the totality of the above listed facts indicate that Trang Vu killed his wife, Tuyet Tran, in an explosion of uncontrolled anger and rage and now is trying to capitalize on his misdeeds by seeking to collect her death benefits.

I reserve the right to supplement this report.

James H. Binford

APPENDIX 0434