# EXHIBIT Z-2

APPENDIX 0444

37 Fed.Appx. 88
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Allen BLACKTHORNE, Defendant-Appellant.

No. 00-51256.
|
May 3, 2002.

Appeal from the United States District Court for the Western District of Texas (SA-00-CR-3-ALL).

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

**Opinion**

RHESA HAWKINS BARKSDALE, Circuit Judge.[*]

**\*1** For Allen Blackthorne's numerous challenges to his convictions for, *inter alia,* conspiracy to use interstate commerce facilities in the commission of murder for hire, primarily at issue are evidentiary rulings concerning: portions of the victim's (Blackthorne's former wife's) deposition in her divorce proceeding against him, in which she recounted threats Blackthorne made against her; and other evidence of threats against the victim, as well as her allegations that Blackthorne sexually abused one of their children.

Blackthorne also contends: the evidence is insufficient to support his convictions; extrinsic evidence of prior inconsistent statements by a key Government witness should have been admitted; the Government elicited false testimony from another key Government witness; a mistrial should have been declared; the jury instructions were erroneous; and an evidentiary hearing should have been held to consider his new trial motion. **AFFIRMED.**

I.

In November 1997, Sheila Bellush, Blackthorne's former wife, was murdered in her home in Sarasota, Florida. Blackthorne and Mrs. Bellush married in 1983. As early as 1985, he began threatening her, saying: if she ever left him, he would either kill her or have her killed; he would have her "taken care of"; her face would be maimed and she would never walk again; and he was in a position to have another person do this.

In 1987, Mrs. Bellush and Blackthorne divorced; she was awarded custody of their two daughters. The ten years following their divorce involved a bitter and protracted battle over custody and child support. Blackthorne withheld child support payments; and, in 1990, without Mrs. Bellush's knowledge, he secured a reduction in his support obligations. In 1991, he attempted to obtain custody; Mrs. Bellush, to increase his support obligations.

During the litigation, the two exchanged accusations. Blackthorne claimed she physically and psychologically abused their daughters; Mrs. Bellush, that he sexually abused one of them. Blackthorne failed in his custody attempt; his support obligations were increased; and this made him "angry" and "upset".

Blackthorne again made threats against Mrs. Bellush. In one instance, while she was visiting her daughters at Blackthorne's home, she and Blackthorne discussed the murder of her friend; according to Mrs. Bellush, it had been committed by her friend's husband. Blackthorne told Mrs. Bellush that the victim "pissed [her husband] off and she got what she deserved". He warned her: "Don't ever piss me off because the same thing will happen to you".

In another instance, Blackthorne told one of his daughters that he "hated" Mrs. Bellush, and he "wanted her dead". He also confided in a co-worker that "he had the contacts to have [Mrs. Bellush] taken to Mexico and she wouldn't return".

In 1997, Mrs. Bellush, who had remarried, refused to allow Blackthorne visitation. In attempting to enforce such rights, Blackthorne accused Mrs. Bellush and her husband of physically abusing one of their daughters. Mrs. Bellush, in turn, again accused Blackthorne of

sexual abuse and sought to have Blackthorne's visitation privileges ended. Blackthorne again sought custody.

 *2  A hearing was held in July 1997, described by the presiding judge as "very acrimonious", with Blackthorne and Mrs. Bellush interested only in "settl[ing] the score" with each other and neither having the children's best interests in mind. When the judge suggested that both families receive counseling, Blackthorne relinquished his paternal rights. According to Blackthorne's secretary, he complained that, in all of the court proceedings, Mrs. Bellush had made the same false child abuse accusations.

That same month (July 1997), while on a trip with Danny Rocha, a bookie and golf companion, Blackthorne complained to Rocha that Mrs. Bellush was abusing their children; Blackthorne asked Rocha whether he knew anyone who would kill her. Rocha responded he did not, but that "if [Blackthorne] wanted to have her beat[en] up, [he] could probably get someone to do that".

Blackthorne decided "that beating her would be a better way of going about stopping her and asked [Rocha] if [he] would help him find someone to do it". As for the severity of the beating, Blackthorne told Rocha that he wanted Mrs. Bellush "crippled in a wheelchair with no tongue". Blackthorne assured Rocha that, if he would "handle the situation" with Mrs. Bellush, he would give him a 25 percent ownership interest in a golf course he planned to build.

The next month (August), Blackthorne asked Rocha if he had found anyone to do what they had discussed; Rocha replied that he had someone in mind, but had not contacted him. Later in August, Rocha approached a friend, Sammy Gonzales, and asked him to find a person willing to assault Mrs. Bellush. That September, after disagreeing with Rocha over a price and who should pay it, Blackthorne agreed to pay $4,000. He gave Rocha the money, as well as Mrs. Bellush's photograph and address in Boerne, Texas.

Rocha convinced Gonzales to hire someone to commit the assault, stating: Blackthorne would pay $5,000; and Gonzales could pay $4,000 and keep $1,000. Rocha gave Gonzales $4,000, Mrs. Bellush's picture and address, and promised to pay the remaining $1,000 later.

That same month, after hitting one of her daughters with her belt, Mrs. Bellush was arrested for child abuse; the daughter was placed in a shelter. The next day, Mrs. Bellush was released. She, her husband, and the rest of their family moved from Texas to Sarasota, Florida, leaving the daughter in the shelter. The State of Texas moved to place the daughter in foster care and a hearing was set for 15 September 1997.

On 12 September, Gonzales unsuccessfully attempted to locate Mrs. Bellush's Texas home. He tried again the next morning, calling Rocha for directions. Rocha obtained the directions from Blackthorne and relayed them to Gonzales.

After receiving the directions, Gonzales enlisted his cousin, Joey Del Toro, to assault Mrs. Bellush for $3,000. That same day, as they drove past Mrs. Bellush's former house, Gonzales recognized a woman he believed to be Mrs. Bellush, but she left before Del Toro could attack her.

 *3  Mrs. Bellush returned to San Antonio on 14 September to attend her daughter's custody hearing. The next day, Mrs. Bellush regained custody and they returned to Florida. That same day, however, Gonzales and Del Toro continued to look for Mrs. Bellush; when they could not find her, Gonzales again called Rocha for assistance.

Rocha, in turn, called Blackthorne, who informed him that, because there had been a hearing that day, they should look for Mrs. Bellush at her attorney's office. Rocha relayed this information to Gonzales and Del Toro; but after driving to the office, they did not find her.

After Mrs. Bellush moved to Florida, fearing Blackthorne, she tried to prevent him from locating her. She used Mail Boxes, Etc. to receive her mail; placed title to her home in a different name; and forbade her daughters from contacting him. Blackthorne, however, made considerable efforts to locate her. He had his secretary attempt to obtain the address from Mrs. Bellush's church in Florida and asked one of his business associates to follow her home from church. Eventually, through the services of a private investigator, Blackthorne obtained her new (Florida) address.

After Mrs. Bellush regained custody of her daughter in mid-September 1997, Blackthorne complained to

Rocha that Mrs. Bellush had "beat" the child abuse case and offered Rocha $50,000 if he got his children back, telling Rocha that "the guys" should "use their imagination". When Rocha asked "what happens if she dies", Blackthorne responded: "So be it". He then told Rocha that the best way for them to receive the $50,000 was "if no one finds the body" and further instructed them to "dump her in the ocean or bury her in the woods".

Rocha told Gonzales that Blackthorne "wants to get it done" and that Blackthorne was offering a $10,000 "incentive" if he got his daughters back. (Rocha, intending to keep $40,000 for himself, reduced the incentive to $10,000.) Gonzales told Rocha, and Rocha acknowledged, that Mrs. Bellush "might die of her injuries". Gonzales did not then commit to go to Florida, and did not commit for Del Toro. Subsequently, Rocha continued to pressure Gonzales to contact Del Toro.

On 4 November 1997, Gonzales arranged for Rocha and Del Toro to meet. Rocha told Del Toro he would be paid $4,000 to go to Florida and assault Mrs. Bellush, but that Blackthorne would also pay $10,000 if he regained custody of his daughters. When Del Toro observed that such a beating could be fatal, Rocha responded Blackthorne was aware of that. And, upon Del Toro's asking how to get the $10,000, Rocha replied the "easiest way ... is just to shoot her". Rocha also told Del Toro that, if he did this job, he would have future employment for him.

Del Toro then asked Rocha and Gonzales if they knew where he could obtain a gun. They told him they did not. Rocha gave Del Toro $500, agreeing to pay an additional $3,500 when he returned; he also gave him Mrs. Bellush's address, which he had received from Blackthorne. Rocha also conveyed to Del Toro Blackthorne's suggestion that there was a strip center near Mrs. Bellush's house where Del Toro could park and walk to Mrs. Bellush's home; he told Del Toro that he should wear casual clothes and that it would be best to do it in the daytime, while Mrs. Bellush's husband was absent.

*4 After obtaining a gun, Del Toro left Texas for Florida on 5 November. He called Gonzales and asked him to tell Rocha he was "on his way". Rocha relayed this information to Blackthorne. On 6 November, Del Toro reported to Gonzales that he had arrived in Florida, had found Mrs. Bellush's house, and was waiting for the best opportunity.

Del Toro murdered Mrs. Bellush in her home on 7 November. He attacked her in the laundry room, shooting her once in the face with a .45 caliber pistol, striking her head with the gun butt, and slashing her throat with a knife. A trail of blood showed Mrs. Bellush dragged herself into the kitchen and collapsed, trying to telephone for help before bleeding to death. Her daughter arrived home from school to find her dead and Mrs. Bellush's 23-month-old quadruplets alone in the house.

Del Toro fled Florida, called Gonzales to tell him he had killed Mrs. Bellush, and asked Gonzales to contact Rocha because he needed money-the remaining $3,500, plus $3,000 of the "incentive". Gonzales notified Rocha, who gave him $3,500 to give to Del Toro.

The night of the murder (7 November), Rocha went to see Blackthorne. After learning Mrs. Bellush had been killed in her home, Blackthorne told Rocha they had "messed up", because they had not followed his directive to dispose of her body so that it would not be found. When Rocha asked Blackthorne for $3,000, as partial payment of the incentive, Blackthorne responded "he didn't have it on him".

Gonzales gave Del Toro $3,500 the next day, and Del Toro described to him how he had murdered Mrs. Bellush: he entered through a window, shot her, and then stabbed her with a kitchen knife when his gun jammed. Del Toro fled to Mexico on 11 November.

Blackthorne met Rocha the same day and gave him $10,000. Rocha confirmed for Blackthorne the accuracy of a sketch of Del Toro that had appeared on television. Blackthorne told Rocha not to say anything, and that "if anybody gets in trouble, ... [Blackthorne would] hire lawyers for everybody". Rocha paid the $10,000 to an attorney after he learned Del Toro had fled.

In January 2000, Blackthorne was charged, under [18 U.S.C. § 1958(a)](), with conspiracy to use interstate commerce facilities in the commission of murder for hire, and, under [18 U.S.C. §§ 2(b)](), [2261(a)(1) and (b)(1)](), with causing another to cross state lines to commit domestic violence. Trial commenced on 12 June 2000; and, after the testimony of, *inter alia,* Rocha and Gonzales, Blackthorne was convicted on 6 July. He was sentenced to concurrent life sentences.

II.

Primarily at issue are the evidentiary rulings regarding Mrs. Bellush's divorce deposition and evidence of Blackthorne's prior threats against Mrs. Bellush, as well as her accusations that he sexually abused their daughter. Blackthorne presents numerous other issues.

A.

Blackthorne, who testified, contends the evidence is insufficient to support his convictions for causing Del Toro to cross state lines to commit domestic violence and for conspiring to use interstate commerce facilities in the commission of a murder for hire. Blackthorne having timely moved for judgment of acquittal, "we view the evidence in the light most favorable to the jury verdict and will affirm if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt". *United States v. Lankford,* 196 F.3d 563, 575 (5th Cir.1999) (internal quotation marks omitted), *cert. denied,* 529 U.S. 1119 (2000). All reasonable inferences must be drawn in favor of the verdict, with "credibility determinations [being] the sole province of the jury". *See United States v. Cathey,* 259 F.3d 365, 368 (5th Cir.2001). Accordingly, it was for the jury to make credibility calls concerning the conflicting testimony presented by Blackthorne and the Government's witnesses, especially Rocha and Gonzales.

1.

**\*5** A violation of 18 U.S.C. § 2261(a)(1) occurs where:

> A person ... travels across a State line ... with the intent to injure ... that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner....

Of course, for aiding and abetting, "[w]hoever willfully causes an act to be done which if directly performed by him ... would be an offense against the United States, is punishable as a principal". 18 U.S.C. § 2(b).

Blackthorne does not contest the sufficiency of the evidence regarding the elements of § 2261(a)(1). Instead, he maintains it is insufficient for his causing Del Toro to cross a state line and injure Mrs. Bellush. According to Blackthorne, neither his $4,000 payment nor the $50,000 incentive caused Del Toro to travel to Florida.

Instead, Blackthorne contends that Del Toro agreed to travel to Florida to assault Mrs. Bellush only after Rocha assured Del Toro he would give him work in the future. According to Blackthorne, this employment assurance, not the monetary incentives he made available, was why Del Toro agreed to go to Florida.

Blackthorne construes § 2(b)'s causation requirement too narrowly. The monetary inducements do not have to be the exclusive cause of Del Toro's violation of § 2261(a)(1). *See United States v. Levy,* 969 F.2d 136, 141 (5th Cir.) (a requirement that the defendant be the sole cause of the act "would render ... § 2(b) meaningless"), *cert. denied sub nom.* 506 U.S. 1040 (1992). Instead, § 2(b) covers anyone who "puts in motion or assists in an illegal enterprise". *United States v. Smith,* 584 F.2d 731, 734 (5th Cir.1978).

The Government contends that Blackthorne's $50,000 incentive put Del Toro in motion. According to the Government, only because Rocha reduced the incentive from $50,000 to $10,000 did he offer Del Toro future work.

We agree that Blackthorne's payment offers put in motion Del Toro's traveling to Florida to assault Mrs. Bellush. Rocha's reducing the incentive for his personal gain does not diminish Blackthorne's culpability. The $50,000 incentive caused Rocha to recruit Del Toro and was, thus, a cause of Del Toro's committing the act.

Furthermore, Rocha's future employment assurance was not the sole cause of Del Toro's accepting the assignment. The money was just as, if not more, important in Del Toro's decision to murder Mrs. Bellush. On their way to meet Rocha, Gonzales told Del Toro: "Danny [Rocha] wants to know if you want to go to Florida". Del Toro replied: "Well, I don't know. *About how much are they*

*willing to pay"*. (Emphasis added.) While meeting with Del Toro, Rocha asked whether he was "[r]eady to go to Florida"; in response, Del Toro wanted "to know *how much money* [Rocha] was going to pay". (Emphasis added.)

Viewing the evidence in the light most favorable to the verdict, a rational juror could have found that Blackthorne's monetary inducements were a cause of Del Toro's traveling to Florida to commit murder; and that, accordingly, causation was proved beyond a reasonable doubt.

2.

**\*6** Blackthorne also contends the evidence is insufficient that he conspired to use interstate commerce facilities in the commission of murder for hire. Its elements are: "(1) traveling or causing another to travel in interstate ... commerce ...; (2) with the intent that a murder be committed ...; and (3) as consideration for the receipt of pecuniary value". *United States v. Sharpe,* 193 F.3d 852, 863-64 n.6 (5th Cir.1999), *cert. denied,* 528 U.S. 1173 (2000); *see* 18 U.S.C § 1958(a).

Blackthorne's argument is threefold: there was an agreement between him, Rocha, Gonzales, and Del Toro only to have Mrs. Bellush beaten, not to have her killed; his payment offers did not cause Del Toro to commit the murder; and Del Toro departed the 4 November meeting with Rocha and Gonzales with the option of beating Mrs. Bellush for $4,000, or harming her severely for $10,000, thereby absolving Blackthorne.

As for Blackthorne's contention that he did not intend for Mrs. Bellush to be murdered, he points to Rocha's disbelief, after being told of Mrs. Bellush's murder, and to his own statement, after learning of the murder, that "[y]ou guys messed up". These statements, however, in no way constitute evidence that Blackthorne did not intend her murder.

Rocha's initial reaction was skepticism that Gonzales and Del Toro had finally carried out what they had been hired to do, rather than "surprise" that Mrs. Bellush had been murdered. According to Rocha, he "was more interested in finding out if Joey [Del Toro] actually killed her or not because [he] still wasn't sure that it actually had

happened". In other words, Rocha wanted to make sure Del Toro had done what he had been paid to do.

A rational juror could find that Blackthorne's assessment that the three had "messed up" was not in reaction to Mrs. Bellush's murder that, instead, Blackthorne was referring to Mrs. Bellush's being murdered in her home. Blackthorne had given Rocha "a couple of scenarios, and his scenarios included no one finding the body". Where Del Toro "messed up" was not in murdering Mrs. Bellush, but in not disposing of her body.

In July 1997, Blackthorne asked Rocha to find someone to murder Mrs. Bellush. That October, when Rocha observed that she could die from a beating, Blackthorne responded: "So be it". Blackthorne also directed that Gonzales and Del Toro "[u]se their imagination" and that they "dump her in the ocean or bury her in the woods".

Blackthorne next asserts that the $4,000 payment and the $10,000 incentive were not offered in consideration for murdering Mrs. Bellush. Instead, according to Blackthorne, the $4,000 was offered in exchange for Mrs. Bellush's beating, with the $10,000 being offered only as incentive for Blackthorne's gaining custody of his daughters.

As detailed above, Blackthorne's intent that Mrs. Bellush be murdered is clear. Although the $10,000 payment was predicated on Blackthorne's gaining custody, he stated that the best way for them to "get their $50,000.00 is if no one finds the body". Blackthorne's contention that he is absolved from the conspiracy by Del Toro's deciding to seek the $10,000 incentive is nonsensical. Assuming *arguendo* the $4,000 payment was solely to have Mrs. Bellush beaten, the fact that Del Toro chose to pursue the $10,000 incentive does not extinguish Blackthorne's culpability: Del Toro's choice to seek this higher remuneration does not change the fact that Blackthorne offered this incentive knowing the end result.

B.

**\*7** Blackthorne maintains videotapes of a television interview with Rocha should have been admitted in evidence. "The admission or exclusion of evidence at trial is a matter committed to the discretion of the trial court"; we review for abuse of that discretion. *United*

*States v. George,* 201 F.3d 370, 373 (5th Cir.), *cert. denied,* 529 U.S. 1136 (2000); *see* FED.R.EVID. 103(a) ( "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected".)

The tapes at issue were out-takes (never aired segments) of an interview conducted in prison for a television documentary that aired in January 2000 about Mrs. Bellush's murder. In that interview, Rocha denied he or Blackthorne knew she was going to die; denied it was their intent for her to die; and stated he had falsely implicated Blackthorne. On cross-examination at trial, Rocha admitted to these prior statements, which were inconsistent with his trial testimony.

Federal Rule of Evidence 613(b), which governs the admissibility of extrinsic evidence of prior inconsistent statements, provides, *inter alia:* "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same". FED. R. EVIDS. 613(b). In construing this Rule, our court has held: "Proof of [a prior inconsistent] statement may be elicited by extrinsic evidence *only* if the witness on cross-examination *denies* having made the statement". *United States v. Devine,* 934 F.2d 1325, 1344 (5th Cir.1990) (emphasis added), *cert. denied,* 502 U.S. 1065 (1992).

Blackthorne claims he offered the tapes not to impeach Rocha's testimony concerning his and Blackthorne's involvement in the murder, but instead to impeach other testimony. Before addressing Blackthorne's contention, it is necessary to describe the evidentiary rulings concerning the tapes. During a break in Rocha's cross examination, the Government moved to exclude the tapes as hearsay. The district court reserved ruling, stating admissibility depended on whether the tapes would be used to show Rocha had earlier contradicted himself, in which case they would be admissible, or whether they would be used to show he had made an inconsistent statement, but had corrected himself, in which case they would not be admissible.

Blackthorne again moved to introduce the tapes during Rocha's cross examination after Rocha stated that both his and Blackthorne's intent was Mrs. Bellush's murder and admitted he had made the prior inconsistent statements in the interview. After objection by the Government, and in a hearing outside the jury's presence, Blackthorne maintained the tapes were admissible "so you can see that earnestly the man [Rocha] looks at the camera and in a very sincere and believable voice, he gives different testimony than he gave here in Court". The objection was sustained.

**\*8** During the continued questioning of Rocha, Blackthorne's counsel asked him about several of his statements made in the taped interview. On the basis that Rocha had no specific recall of the words he then used, Blackthorne moved to admit the tapes as a past recollection recorded under FED.R.EVID. 803(5). The Government objected, but the district court allowed Rocha during the next recess to review the tapes to refresh his memory.

After reviewing the tapes, Rocha again admitted to making the prior inconsistent statements. Blackthorne moved to admit the tapes for the purpose of impeaching Rocha's testimony that he was a bad liar, after the following testimony by Rocha:

> Q. Now, having reviewed those tapes, and seeing what your demeanor was on the tape, your inflection on the tape, how you answered the questions on the tape, would you agree that you came across on that tape as a very truthful, honest individual?
>
> A. No, I do not agree.

Blackthorne contends the tapes were admissible not only to impeach Rocha's testimony that he was a bad liar, but also "to allow the jury to determine how persuasive a liar he was so that the jury could intelligently assess his credibility". Blackthorne contends the tapes were relevant for these other purposes under Rule 401. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". FED.R.EVID. 401.

Assuming *arguendo* that the tapes do not constitute extrinsic evidence of prior inconsistent statements, and that Rocha's opinion concerning whether he was credible in the taped interview is relevant, the tapes are still subject to Rule 403's balancing test: their probative value must *substantially* outweigh the "danger of unfair prejudice, confusion of the issues, or delay, waste of time, or needless presentation of cumulative evidence". FED.R.EVID. 403.

Rocha's opinion on this point has little probative value on whether he was credible-a matter for the jury to decide. Conversely, the danger of unfair prejudice and confusion of the issues is great. Accordingly, there was no abuse of discretion.

C.

Blackthorne claims it was error to admit his prior threats against Mrs. Bellush, as well as Mrs. Bellush's allegations he had abused one of their daughters. He maintains: the district court should not have ruled pre-trial on admissibility; he was never given a chance to rebut the evidence of abuse; the Government repeatedly delved into the issue of abuse; and a mistrial should have been declared when a witness stated Blackthorne had been investigated on the basis of the abuse allegations.

1.

Regarding this evidence, Blackthorne moved *in limine* a week before trial, asserting the evidence should not be admitted pursuant to Rules 402, 403, and 404(b). On 12 June, the day trial began, the district court denied the portion of the motion concerning the threats and abuse allegations. (Blackthorne's motion was granted, however, concerning alleged assaults by Blackthrone against Mrs. Bellush pending a hearing on their relevance).

*9 Pursuant to the rule extant at the time of Blackthorne's trial, if a motion *in limine* is overruled, the movant must "renew his objection when the evidence is about to be introduced at trial". *United States v. Graves,* 5 F.3d 1546, 1551 (5th Cir.1993) (internal quotation marks omitted), *cert. denied,* 511 U.S. 1081 (1994). The purpose of that rule was "to allow the trial judge to reconsider his in limine ruling with the benefit of having been witness to the unfolding events at trial". *Id.* at 1552. (Such motion-renewal is no longer necessary under certain circumstances. Pursuant to an amendment to Rule 103(a), effective 1 December 2000, where the district court "makes a *definitive* ruling on the record admitting or excluding evidence, either at or *before trial,* a party need not renew an objection ... to preserve a claim of error for appeal". FED.R.EVID. 103(a) (emphasis added). This amendment does not apply to Blackthorne because his conviction occurred prior to the amendment.)

Blackthorne objected under Rules 403 and 404 when evidence of the threats and abuse allegations were introduced at trial. Accordingly, we review the evidentiary rulings for abuse of discretion. *See George,* 201 F.3d at 373.

a.

The Government introduced the following evidence of Blackthorne's threats: between 1985 and 1987, he threatened to kill Mrs. Bellush if she ever left him or hurt his business, including that he would have her "taken care of" and would have someone else do it; between 1988 and 1992, he told his daughter he hated Mrs. Bellush, wanted her dead, and "wouldn't care if she was killed", because she caused others to lie about him; in 1990 he threatened to kill her if she ever angered him; and in 1992, he stated he had the contacts to have her taken to Mexico and "she wouldn't return".

Under Federal Rule of Evidence 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

FED.R.EVID. 404(b). Whether evidence of prior bad acts, such as these threats, is admissible involves a two step test. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403." *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U .S. 920 (1979).

Blackthorne challenges the threats' admissibility on the basis they are too remote to the 1997 murder. "Although the remoteness of extrinsic acts evidence may weaken its probative value, the age of the prior [act] does not bar its use under Rule 404." *United States v. Broussard,* 80 F.3d 1025, 1040 (5th Cir.), *cert. denied sub nom.* 519 U.S. 906 (1996).

**\*10** The threats occurred between approximately five and 12 years before the murder. In *United States v. Richards,* 204 F.3d 177, 200 (5th Cir.), *cert. denied sub nom.* 531 U.S. 826 (2000), we upheld the admission of acts occurring three to five years before the charged offense; in *United States v. Hernandez-Guevara,* 162 F.3d 863, 872-73 (5th Cir.1998), *cert. denied,* 526 U.S. 1059 (1999), admission of an 18-year-old conviction; and in *United States v. Chavez,* 119 F.3d 342, 346-47 (5th Cir.), *cert. denied sub nom.* 522 U.S. 1021 (1997), admission of a 15-year-old conviction.

Obviously, in the light of Blackthorne's defense that he did not intend that Mrs. Bellush be murdered, his intent was a fundamental facet of the Government's case and these threats were relevant to that intent. They are also highly probative, substantially outweighing any prejudicial effect their remoteness may have had: they demonstrate a pattern of Blackthorne's desire to harm, or more specifically, to have someone else harm, Mrs. Bellush. *See, e.g., United States v. Hadley,* 918 F.2d 848 (9th Cir.1990) (upholding admission of a "regular pattern" of similar conduct over a ten-year period, despite a ten-year hiatus between the most recent prior conduct and the charged conduct), *cert. dismissed,* 506 U.S. 19 (1992).

Such a pattern is especially probative in this case. The threats occurred during the ten-year custody battle following Blackthorne and Mrs. Bellush's divorce.

b.

Regarding the admission of Mrs. Bellush's abuse allegations, Blackthorne contends they are not relevant; more prejudicial than probative; unproven; and remote.

As for relevancy, the Government offered the abuse allegations to demonstrate Blackthorne's motive. In the post-divorce, protracted custody battle, Blackthorne and Mrs. Bellush traded such allegations. These allegations angered him and, therefore, are highly relevant as to why he would want Mrs. Bellush dead.

Their probative value also substantially outweighs any prejudicial effect. Obviously, child abuse allegations can be prejudicial; but the limiting instructions, discussed *infra,* cured any excessive prejudice. Furthermore, brought to the jury's attention was the fact that the allegations were only made, not that they were true. Accordingly, Blackthorne has not demonstrated their inadmissibility under Rule 403.

Blackthorne also contends the Government was required, under Rule 404(b), to prove the truth of the abuse allegations. *See Huddleston v. United States,* 485 U.S. 681, 689 (1988) ("In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude the act occurred and that the defendant was the actor."). The Government responds: the allegations do not fall under Rule 404(b) as extrinsic evidence of other crimes, wrongs, etc.; instead, their relevance was Mrs. Bellush's making the allegations, not that Blackthorne had committed the claimed abuse.

**\*11** The district court held: "the evidence of *allegations* is probative both on the question of motive and for the purpose of establishing the relationship between [Blackthorne] and Bellush. Rule 404(b) is inapplicable here, where the evidence is not offered to show that [Blackthorne] did engage in the alleged conduct". (Emphasis in original.)

We agree. The Government did not seek to introduce evidence of prior bad acts. Instead, it introduced evidence that Mrs. Bellush made the allegations against Blackthorne; the veracity of those allegations was irrelevant to the question of Blackthorne's motive. Accordingly, the Government was not required to prove their truth.

Similar to his challenge to the prior threats, Blackthorne contends the abuse allegations are too remote. According to him, the allegations occurred in the May 1991, January 1992, June 1993, and June/July 1997 child custody modification/enforcement actions.

Our prior remoteness analysis regarding the threats concerned Rule 404(b). Although we have held the abuse

allegations are not Rule 404(b) evidence, our court has recognized that remoteness is a question of relevance. See *United States v. Grimes,* 244 F.3d 375, 384-85 (5th Cir.2001) (holding evidence of prior acts relevant despite a gap in time).

The abuse allegations are not too remote. This was an ongoing pattern and practice, with the most recent allegations having been made approximately only four months before the murder. Our having held, in some instances, that 15 and 18 years is not too remote, these allegations, made from several months to approximately six years before the murder, are likewise not too remote.

2.

As the basis for his claim that the district court should not have ruled pre-trial on the admissibility of the threats and abuse allegations, Blackthorne maintains the Rule 403 balancing test could not be performed until the evidence was offered at trial "because the incremental probity of the evidence must be balanced against the prejudice".

In the pre-trial motion *in limine,* discussed *supra,* in addition to moving to exclude, *inter alia,* evidence of the threats and abuse allegations, Blackthorne stated that it would be impossible for the district court to then rule on those issues. It does not appear that Blackthorne renewed this objection when this evidence was admitted at trial.

The failure to renew, however, does not prevent preservation of this claimed error. As discussed *supra,* we explained in *Graves* that the purpose of a renewed objection at trial, following an adverse *in limine* ruling, "is to allow the trial judge to reconsider his [earlier] ruling with the benefit of having been witness to the unfolding events at trial". 5 F.3d at 1552. This purpose is inapplicable here; this issue solely concerns the propriety of ruling pre-trial, not the propriety of the evidentiary ruling. Accordingly, we review the ruling for abuse of discretion. See *George,* 201 F.3d at 373.

**\*12** The district court's pre-trial, written ruling is detailed and comprehensive. Other than the above-quoted general contention, Blackthorne offers no specific explanation as to why these issues were not appropriate for a pre-trial ruling. Even assuming *arguendo* the district court erred in ruling then, Blackthorne had, and took advantage of, the opportunity when the evidence was presented to renew his objections. When he did so, the district court ruled on such renewed Rules 403 and 404 objections. This opportunity cured any claimed error in the timing of the district court's ruling pre-trial.

3.

Claiming the district court erred in "allowing the government to repeatedly delve" into the abuse allegations, Blackthorne cites the testimony of nine witnesses who mentioned the allegations. However, he does not complain of the manner, or of the extent, that these witnesses testified.

Again, the allegations were essential to prove motive. Blackthorne has not shown the district court abused its discretion in allowing the Government to use this number of witnesses to corroborate Mrs. Bellush's making the allegations.

4.

Blackthorne also asserts the district court erred in not allowing him to disprove the abuse allegations, claiming he demonstrated to the district court that the allegations were false. Again, the truth of those allegations was not relevant; of relevance was whether they were only made. As the district court correctly ruled, "where the evidence is not offered to show that [Blackthrone] did engage in the alleged conduct[,] the Court [should] not permit the question of the truth of the allegations to be litigated".

5.

Blackthorne next challenges the denial of the mistrial he sought when a witness testified that law enforcement had investigated the abuse allegations. The denial is reviewed for abuse of discretion. *E.g., United States v. Honer,* 225 F.3d 549, 555 (5th Cir.2000); *United States v. Paul,* 142 F.3d 836, 844 (5th Cir.) ("refusal to grant a mistrial based on the admission of prejudicial evidence is reviewed for an abuse of discretion"), *cert. denied,* 525 U.S. 919 (1998).

On direct examination by the Government, Shannon Garcia, an investigator with the Child Protective Services

Division of the Texas Department of Protective and Regulatory Services, testified that a sheriff's department detective attempted to obtain from her a "videotape of the sexual abuse" allegations by Blackthorne's daughter. Blackthorne maintains this put the truth of the allegations at issue and prejudiced him.

"If the motion for mistrial involves the presentation of prejudicial testimony before a jury, a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in [the] light of the entire record." *Paul,* 142 F.3d at 844. In addition, a cautionary instruction can obviate the need for a mistrial. *See, e.g., United States v. Barfield,* 527 F.2d 858, 862 (5th Cir.1976) (because the "instruction was adequate to assuage the prejudice injected by the remark ... the district court did not err in overruling defendant's motion for mistrial").

**\*13** The Government contends the testimony was not prejudicial because it did not imply the allegations were true, only that they were investigated. Also, the Government points to the limiting instruction given the jury on the next morning of testimony:

> As you have heard me say from time to time, throughout this trial, the allegations between Allen Blackthorne and Sheila Bellush reflected in the pleadings and testimony were only allegations.... In addition, I had previously instructed you that Sheila Bellush's allegations that Allen Blackthorne had sexually abused their daughter ... must not be considered by you as true. I want to reemphasize that instruction. So I'll instruct you that Sheila Bellush's allegations that Allen Blackthorne had sexually abused their daughter ... must not be considered by you as true. So you should not think or even suspect that Allen Blackthorne sexually abused [her]. *That's not part of this case, and it's being brought out merely to show some of the allegations that were made.*

(Emphasis added.)

In the light of the entire record (particularly the evidence against Blackthorne, discussed *supra* ), the limiting instruction, and the nature of Garcia's statement, there is not a *significant* possibility that this evidence had a *substantial* impact on the jury verdict.

D.

Consistent with his objection at trial, Blackthorne next maintains that portions of Mrs. Bellush's 1987 divorce deposition should not have been admitted in evidence. Again, we review for abuse of discretion. *See George,* 201 F.3d at 373.

In the portions of her deposition read to the jury, Mrs. Bellush stated that Blackthorne threatened: to kill her or have someone else do so; to make sure she would never walk again; and to maim her face. This evidence was admitted pursuant to Rule 804(b)(1).

Under that Rule, excepted from the prohibition on hearsay is:

> Testimony given as a witness at another hearing of the same or a different proceeding, *or in a deposition* taken in compliance with law in the course of the same *or another* proceeding, if the party against whom the testimony is now offered ... had an opportunity and *similar motive* to *develop* the testimony by direct, cross, or redirect examination.

FED.R.EVID. 804(b)(1) (emphasis added).

### 1.

Blackthorne contends he did not have a similar motive to develop this testimony during the divorce deposition. It did not exist, according to him, because "where a party is trying to ascertain what the other side has in the way of dirt in a divorce case[,] ... [Blackthorne's] counsel would [not have] want[ed] to cross examine [Mrs. Bellush] on everything possible: that would be done at the time of the divorce trial (for strategic reasons)". (Parenthetical in original.) The Government responds: Blackthorne had a similar motive to discredit the testimony during the divorce deposition because it was critical to child custody, property division, and tort liability issues.

**\*14** In *United States v. McDonald,* 837 F.2d 1287 (5th Cir.1988), McDonald and Minteer engaged in a scheme to defraud ANICO, an insurance company. Once aware of the fraud, ANICO sued McDonald and Minteer. While the civil action was pending, McDonald and Minteer were indicted.

Prior to their indictment, however, ANICO took Minteer's civil discovery deposition; it was exculpatory of McDonald. During the criminal proceedings, when Minteer exercised his Fifth Amendment right not to testify, McDonald moved unsuccessfully, under Rule 804(b)(1), to admit Minteer's helpful deposition.

Our court upheld that ruling on the basis ANICO and the Government would not have had similar motives:

> [A]lthough ANICO and the government had similar status in their respective claims, ... the trial strategies were not sufficiently similar to admit the Minteer deposition. Minteer's deposition was taken before either McDonald or Minteer had been indicted, thus ANICO, knowing that it would have the opportunity to cross-examine Minteer at trial did not have the same incentives to then develop inaccuracies in the deposition testimony. The government had no opportunity to examine Minteer at [the criminal] trial, because he exercised his right not to testify. Aware of that risk, the government would, as in most cases, have had a strong incentive to develop fully the testimony at the time of the [earlier civil] deposition.

*McDonald,* 837 F.2d at 1293.

*McDonald* essentially placed the Government, with the circumstances that it faced in the criminal trial, in ANICO's shoes at the time of the deposition and determined that the motives were not similar. The same is true here. Had Blackthorne been faced at the time of the deposition with the circumstances he faced in this criminal matter, he obviously would not have waited to develop any flaws or inconsistencies in Mrs. Bellush's deposition testimony, especially knowing she would not be subject to cross-examination in her own murder trial.

Rule 804(b) (1) "does not require that the party against whom the prior testimony is offered had a compelling tactical or strategic incentive to subject the testimony to cross-examination, only that an opportunity and similar motive to develop the testimony existed". *United States v. Mann,* 161 F.3d 840, 861 (5th Cir.1998), *cert. denied,* 526 U.S. 1117 (1999). On the other hand, pursuant to *McDonald,* where the party in the subsequent action has a compelling incentive to subject the testimony to cross-examination, but did not have that incentive at the time of the deposition, there is no similar motive. Accordingly, the district court erred in admitting the deposition testimony.

### 2.

Our analysis, of course, does not end here. "If we find an abuse of discretion, then we decide whether ... it constitutes harmless error." *United States v. Munoz,* 150 F.3d 401, 412 (5th Cir.1998), *cert. denied,* 525 U.S. 1112 (1999). "Harmless error is [a]ny error, defect, irregularity or variance which does not affect substantial rights. It arises when the mistake fails to prejudice the defendant. Prejudice occurs when the error ha[s] affected the outcome of the district court proceedings." *Id.* at 412-13 (internal quotation marks, citations, and footnote omitted.)

**\*15** The deposition testimony did *not* affect the outcome of the proceedings. As discussed *supra,* the evidence against Blackthorne, particularly through Rocha's and Gonzales' testimony, was exceptionally strong.

Furthermore, the portions of the deposition read to the jury pertained only to threats Blackthorne allegedly made against Mrs. Bellush. Other evidence firmly substantiated Blackthorne's making them. Mrs. Bellush's sister testified that she witnessed Blackthorne threaten to kill Mrs. Bellush; Blackthorne's business associate, that Blackthorne told him "he had the contacts to have [Mrs. Bellush] taken to Mexico and she wouldn't return"; and Mrs. Bellush's daughter, that Blackthorne told her he "wouldn't care if [Mrs. Bellush] was killed. He wanted her dead".

Mrs. Bellush's deposition was cumulative of this testimony. Arguably, it had less credibility because it was given during contentious divorce proceedings. Mrs. Bellush and Blackthorne were engaged in a bitter custody dispute; her motive for veracity was arguably less than the above-described witnesses. The error was harmless.

E.

Blackthorne maintains the Government elicited false testimony from Gonzales in violation of *Napue v. Illinois,* 360 U.S. 264 (1959) (due process denied where Government elicits false testimony it knows to be false, or, while not eliciting the testimony, knows of its falsity and allows it to go uncorrected). A new trial based on a *Napue* violation is proper only where: "(1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material". *United States v. O'Keefe,* 128 F.3d 885, 893 (5th Cir.1997), *cert. denied,* 523 U.S. 1078 (1998). A statement is "material" if there is a "reasonable probability of a different outcome". *Id.* at 894 (internal quotation marks omitted).

The Government contends that, because Blackthorne did not make a *Napue* objection, we should review only for plain error. Blackthorne responds that a *Napue* violation is structural error, and no objection is necessary to preserve it. We need not resolve this issue; Blackthorne's claim fails under even the traditional, more lenient, standard of review.

On direct examination by the Government, Gonzales testified: on 13 September 1997, he and Del Toro were in Boerne, Texas, attempting to locate Mrs. Bellush; and he "saw her in the backyard". Blackthorne contends this testimony is false, and the Government knew it to be so, because Mrs. Bellush's airline flight schedule, produced by the Government to the defense, reflects that she did not travel from her new home in Florida to Texas until 14 September, a day *after* Gonzales testified he saw her in Texas.

The Government maintains the testimony was not false because, on cross-examination, Gonzales clarified that he *thought* the woman he saw was Mrs. Bellush, based on pictures Blackthorne had provided Rocha. Alternatively, the Government contends the claimed false testimony was not material, because any falsity was fully explored and corrected on cross-examination.

**\*16** Where falsehoods are "sufficiently exposed before the jury to enable the jury to weigh those falsehoods in its deliberations", such falsehoods are not material, because "enough information was provided to the jury to enable [it] to adequately perform [its] fact-finding function and to maintain the level playing field between the prosecution and the defense". *O'Keefe,* 128 F.3d at 896-97.

Any false information Gonzales may have conveyed to the jury was corrected. The testimony was not material.

F.

Blackthorne next contends, with respect both to Count Two of the indictment (causing another to cross state lines with the intent to commit domestic violence), and to the evidence of the abuse allegations, that the district court erred both in its jury charge and by refusing to give his requested instructions.

"We review jury instructions to determine whether the court's charge as a whole[ ] is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Stouffer,* 986 F.2d 916, 925 (5th Cir.) (internal quotation marks omitted), *cert. denied,* 510 U.S. 837 (1993). Concerning requested instructions being refused, we review for abuse of discretion, determining:

"whether the requested instruction (1) is a correct statement of the law; (2) was substantially given in the charge as a whole; and (3) concerns important aspects of the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense". *Id.* at 925-26 (internal quotation marks omitted).

1.

For Count Two, Blackthorne contends the district court erred by instructing the jury could find Blackthorne *directly or indirectly* caused Del Toro to cross state lines. Blackthorne objected to the inclusion of "directly or indirectly". According to him, the instruction was erroneous because this language does not appear in 18 U.S.C. § 2(b), and its use results in a constructive amendment of the indictment, which charged that he caused Del Toro to cross state lines.

a.

Section 2(b) does not include the language "directly or indirectly". But, as discussed *supra,* it covers one who knowingly and willfully "puts in motion" or "assists in" an illegal enterprise. *United States v. Smith,* 584 F.2d 731, 734 (5th Cir.1978). Furthermore, as also discussed *supra,* § 2(b) does not require that Blackthorne be the sole cause of the performance of the act. *See United States v. Levy,* 969 F.2d 136, 141 (5th Cir.1992).

b.

Blackthorne's contention that the instruction constructively amended the indictment is equally without merit. "A constructive amendment of the indictment occurs when the jury is permitted to convict the defendant on a factual basis that effectively modifies an essential element of the offense charged in the indictment." *United States v. Millet,* 123 F.3d 268, 272 (5th Cir.1997), *cert. denied,* 523 U.S. 1023 (1998).

**\*17** *Millet,* a Hobbs Act prosecution, held: "[W]hen the indictment is drawn generally, the government may offer proof that the act either *directly or indirectly affected interstate commerce". Id.* at 274 (emphasis added). Likewise, the use of "directly or indirectly" in the case at hand did not modify the generally charged essential element of the offense: that Blackthorne caused Del Toro to cross state lines.

2.

Also for Count Two, Blackthorne contends the district court erred in not giving his requested instruction on causation. It states, in part: the jury should determine whether Del Toro traveled to Florida *solely* because of Blackthorne's promise of money, or whether he so traveled because of Rocha's promise of future employment; and unless the jury found Del Toro traveled to Florida *solely* because of Blackthorne's promise of money, it must acquit on Count Two.

The instruction would have required Blackthorne to be the sole cause of Del Toro's crossing state lines. As discussed *supra,* it was not a correct statement of the law.

3.

Again for Count Two, Blackthorne bases error on the refusal to give part of his proposed instruction relating to his theory of the case. The requested instruction stated it was Blackthorne's position that he did not cause Del Toro to travel to Florida; that it was Rocha who did so with his future employment promise.

This was another attempt to have the jury instructed that, if Rocha's claimed incentive of future employment in any way caused Del Toro to cross state lines, then Blackthorne was absolved of guilt. As discussed *supra,* even if Rocha's future employment offer was *a* cause of Del Toro's traveling to Florida, Blackthorne is still culpable under 18 U.S.C. § 2(b). *See Levy,* 969 F.2d at 141. The rejected portion, therefore, is not a correct statement of the law and would have been potentially confusing to the jury.

4.

Blackthorne challenges the limiting instructions concerning the abuse allegations. The district court gave them four times. The first stated, in part: "[N]obody says that it happened or didn't happen". The error, according

to Blackthorne, is that "no one would stand silently by when accused of sexual abuse and not deny the allegation, unless he was guilty".

For the second instruction, Blackthorne contends the court's statement that the truth of the allegations was not an issue in the trial implied the allegations were true. For the third, he complains it "merely informed the jury that all of the allegations contained in the divorce related proceedings were not being offered for the truth of the matters asserted". Finally, concerning the fourth, Blackthorne reaches the heart of his compliant: the court did not instruct the jury the allegations were false.

Blackthorne does not demonstrate that the limiting instructions as a whole were not a correct statement of the law. He relies on *Bruton v. United States,* 391 U.S. 123, 135 (1968), which observed that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored". According to Blackthorne, child abuse is such a context.

**\*18** The limiting instructions were more than adequate. The jury was repeatedly admonished that the truth of the allegations was not at issue, and that it was only to consider, for limited purposes, the fact that the allegations were made.

5.

Concerning the evidence of Blackthorne's prior threats to harm Mrs. Bellush, the court instructed the jury, in part, that if it found from the evidence, other than the threats, that Blackthorne committed the acts charged in the indictment, only then could it consider the threats for the limited purposes of determining Blackthorne's intent, motive, and state of mind, as well as in determining the relationship between Blackthorne and Mrs. Bellush. Blackthorne contends the limiting instruction concerning the abuse allegations should also have contained this language, and moved the district court to include it. That instruction essentially stated: the jury must not consider the abuse allegations as true; it could not consider the prior acts in determining Blackthorne's innocence or guilt; and it could consider the allegations only for very limited purposes.

The language Blackthorne contends should have been included in the limiting instruction is found in Fifth Circuit Pattern Jury Instruction 1.30. *See* 5TH CIR. PATTERN JURY INSTRUCTIONS § 1.30 (West 1990). That instruction is entitled "SIMILAR ACTS", with the first sentence stating: "During this trial, you have heard evidence of *acts* of the defendant which may be *similar to those charged* in the indictment, but which were committed on other occasions". *Id.* (emphasis added.)

Obviously, the pattern instruction is intended to be used where evidence of similar acts is introduced. The abuse allegations are not evidence of any act *by Blackthorne;* instead, they are evidence of allegations made *by Mrs. Bellush.* Furthermore, the conduct alleged in those allegations is in no way similar to the charged conduct.

G.

The district court is claimed to have erred in answering the following question from the jury: "Can [we] have [an] instruction on 'state of mind'?". "The trial judge retains his discretion to tailor his jury instructions when he must supplement them during the jury's deliberations." *United States v. Duvall,* 846 F.2d 966, 977 (5th Cir.1988). "When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." *United States v. Sylvester,* 143 F.3d 923, 926 (5th Cir.1998) (internal quotation marks omitted).

Over Blackthorne's objection, the court answered: "State of mind means 'intent' or 'knowingly' as those terms have been used in these instructions". Blackthorne maintains the answer was incorrect because, under the dictionary definition, a person's state of mind encompasses more than intent and is subject to change.

**\*19** The Government responds that the supplemental instruction was adequate because, when state of mind was used in the instructions, it was synonymous with intent. Concerning the abuse allegations, the court had instructed the jury could consider the allegations "to determine whether the Defendant had the state of mind or intent necessary to commit the crime". Concerning the threats,

the jury was instructed it could consider them for, *inter alia,* "determining whether the Defendant had the state of mind or intent necessary to commit the crimes charged". Finally, in defining intent, the court had instructed: "You may consider any statement made by the defendant and all other facts and circumstances in evidence which indicate his *state of mind"*. (Emphasis added.)

State of mind may encompass meanings other than knowingly or intent; but, as the term was used in the jury instructions, it was synonymous with intent. Accordingly, the supplemental instruction was reasonably responsive to the jury's inquiry; and, along with the earlier instructions, it allowed the jury to understand the issues presented to them.

### H.

The final claimed error is premised on the district court's not holding a hearing to consider Blackthorne's new trial motion premised, in part, on Rocha's recantation of his testimony. Restated, Blackthorne does not challenge the motion's denial, only the lack of an evidentiary hearing. We review for abuse of discretion. *E.g., United States v. Aguiar,* 610 F.2d 1296, 1305 (5th Cir.), *cert. denied sub nom.* 449 U.S. 827 (1980).

In an undated affidavit claimed to have been delivered to Blackthorne's attorney approximately two-and-a-half months after the verdict, Rocha stated: Blackthorne "had nothing to do with the murder"; Rocha's "motive to get involved" was Blackthorne's "status"; and Rocha thought that, if he murdered Mrs. Bellush, he "could go back to [Blackthorne] and benefit from this in some form of a business deal". Blackthorne states that, in addition to Rocha's affidavit, given to Blackthorne's civil attorney, that attorney recorded his conversations with Rocha, for use by the court.

"Generally, a motion for new trial may be decided upon affidavits without evidentiary hearings." *United States v. Metz,* 652 F.2d 478, 481 (5th Cir. Unit A Aug. 1981). Blackthorne's contention is based on his not being able to develop Rocha's recantation through use of the taped conversation. He does not assert, however, that he made the district court aware of the tapes. Furthermore, he never mentioned them in his new trial motion. Instead, he stated: "The Court may not be aware that on September 22, 2000, ... Rocha recanted his trial testimony *by affidavit"*. (Emphasis added.) Moreover, neither Rocha's affidavit, nor that of the attorney who purportedly recorded the recantation, mentions the tapes.

The district court did not abuse its discretion by not holding an evidentiary hearing to consider tapes of which it was unaware.

### III.

**\*20** For the foregoing reasons, the judgment is ***AFFIRMED.***

**All Citations**

37 Fed.Appx. 88, 2002 WL 971621

### Footnotes

\*   Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.